

# In the Missouri Court of Appeals
# Eastern District

### DIVISION III

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED99608 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of Audrain County |
| vs. | ) | |
| | ) | Honorable Keith M. Sutherland |
| DOUGLAS J. HOWERY, | ) | |
| | ) | |
| Appellant. | ) | FILED: April 1, 2014 |

Introduction

Appellant Douglas Howery ("Howery") appeals from the judgment of the trial court following his conviction by a jury of first-degree murder, Section 565.020.[1]  Howery argues on appeal that the trial court erred in overruling his motion for judgment of acquittal at the close of all the evidence, accepting the jury's verdict of guilty of first-degree murder, and entering judgment and sentence when the evidence was insufficient to prove that he committed first-degree murder.  Howery also contends that the trial court abused its discretion in admitting hearsay evidence, character evidence, and evidence of uncharged bad acts.  We affirm the judgment of the trial court.

---

[1] All statutory references are to RSMo 2000.

<u>Factual and Procedural History</u>

Viewed in the light most favorable to the verdict, the following evidence was adduced at trial: Howery and his wife, Betty Howery ("Betty"), lived on a farm in Annada, Missouri, in Pike County. The farm property was originally purchased by Betty in 1984, but she later transferred ownership to herself and Howery jointly after they were married. The farm property had a home on it that was serviced by a septic tank, as well as several outbuildings and sheds.

Betty and Howery had a rocky relationship that involved heated arguments. Betty told her sister that she was thinking about getting a divorce. Betty also told her son, Matthew Higginbotham ("Higginbotham"), that there were problems with the relationship and that she was trying to leave. Betty told Higginbotham that if anything ever happened to her, half of the farm would be his.

In early 1991, Howery began an affair with a woman named Donna. When Donna discovered that Howery was married, she confronted him about his marriage. Howery told Donna that his marriage to Betty was over and that they were getting a divorce. Donna became uncomfortable with their relationship and told Howery that he needed to decide whether or not his marriage to Betty was over. Howery convinced Donna that the marriage was over and they resumed dating in mid-1991.

In November 1991, Betty and Howery's home on the farm in Annada burned down. Betty and Howery received an insurance settlement of more than $214,000 as a result of the fire, and they moved to an apartment in St. Charles. After the fire, Betty and Howery argued about the money they received from the settlement, and Betty appeared upset, nervous, and unhappy to co-workers.

In February 1992, Betty and Howery used a portion of the settlement to purchase a piece of property with a man named Melvin Kinnard ("Kinnard"). Howery and Kinnard were going into business together, although the business was in Donna's name. Around this time, Betty suspected that Howery was having an affair and began calling Kinnard asking for Howery's whereabouts. On February 19, 1992, Kinnard told Howery that he needed to do something about the situation because he would not lie for Howery about his relationship with Donna. At that time, Howery knew Donna was pregnant with his child.

On February 20, 1992, Howery and Donna went to Betty's workplace. Howery instructed Donna to drive Betty's vehicle back to Donna's house. They did not leave another car for Betty, and Donna did not question why they picked up Betty's vehicle. Donna did not see Howery again until the next day.

While at work on February 20, Betty received a phone call that upset her, which had something to do with her account being cleaned out. Betty left work before her shift ended and went with Howery, who picked her up and drove to a title company where they signed documents for the property they were purchasing for the joint business with Kinnard.

After signing the documents at the title company, Howery and Betty drove to the farm in Annada. Betty called her father from an outbuilding on the farm to tell him they would no longer need to borrow the money he was planning to lend them to buy a new home. Howery also spoke on the phone with Betty's father. Howery told Betty's father that he did not want to go into debt and would rather rent than purchase a new home. After Betty spoke with her father, no one but Howery saw or heard from Betty again.

The following day, February 21, Howery called Betty's work and left a message saying that Betty would be taking a vacation day. Howery then picked up Donna and his first words to

3

her were "well now it's on." When Donna asked what he meant, Howery explained that he and Betty had a fight the night before and that he left Betty at the farm. Howery said he told Betty all about Donna and their plans to move in together. From that day on, Howery spent every night with Donna, and the couple moved in together two weeks later.

On February 23, Betty's sister held an 80th birthday party for their father. When Betty did not show up at the party, Betty's sister called Higginbotham. Unable to contact his mother and concerned for her safety, Higginbotham contacted St. Charles police and made a missing persons report.

St. Charles police contacted Howery about Betty's disappearance. Howery told police that on February 20, he had driven Betty to the farm after they signed the paperwork at the title company. While at the farm, Betty and Howery argued about the insurance settlement money. Howery said Betty allegedly showed him ten to twelve thousand dollars in cash in her purse that she had saved. Howery said that he told Betty it did not matter because they might not be together much longer and that they might be getting divorced. Howery told police that Betty wanted him to take her back to the city to get her vehicle, but that she finally told him just to leave her at the farm. Howery said that Betty told him she would have someone take care of her, so he left her at the farm around 7:45 p.m. with no car. Howery said he returned to the property on the following Saturday and the following Monday to see if Betty was still there, but she was not.

On February 26, police searched the farm with Howery's consent. Howery accompanied the officers during the search and showed them everything on the property. Howery did not alert the police to the property's septic tank. The officers neither knew there was a septic tank on the property, nor did they notice any holes in the ground or an access point to a septic tank. Howery

4

told the officers that he and Betty had gotten into an argument because Betty wanted to buy a new home but he did not want to due to their marital problems and his relationship with Donna. Howery said that Betty became angry when he admitted he was having an affair, but that their argument was only verbal. Howery told the officers that when he told Betty it was time to leave, Betty said she would call somebody that cared. Howery then left Betty at the farm with no means of transportation. Howery further told the officers that after he left the farm, he got all the way back to their apartment but decided to head back to the farm without ever exiting the vehicle. Howery then changed his mind again just before reaching the farm and turned back toward St. Charles. Rather than taking a direct route, Howery went out of his way and drove a longer, indirect route back to St. Charles. When asked why he drove the longer route, Howery first said that he did not know. About 10 minutes later, Howery volunteered that the route he drove would allow him to take some back roads to go back to the farm if he changed his mind again.

Between February 1992 and June 1998, police had no significant leads as to Betty's whereabouts. In 1998, law enforcement officers reviewed the previous reports that were written in 1992 and interviewed some people including Kinnard, who had not been interviewed in 1992. Kinnard told police that sometime after closing on the business property, Howery told Kinnard that Betty "wouldn't be bothering [him] anymore." The information from Kinnard led to another search of the farm property, this time with cadaver dogs. Police found no sign of Betty.

In 2000, Howery obtained a divorce from Betty, and all the property that he held jointly with Betty was placed in his name. About a month later, Howery and Donna were married.

In 2007, Kinnard sold the farm property to an LLC. In 2008, the new owner hired a work crew to clean up the property. The workers were trying to remove some concrete surrounding a

5

hole in the ground when they discovered an underground septic tank that was approximately six feet wide and eight feet deep. As the workers attempted to remove the septic tank with a lift bucket, the septic tank broke into three pieces and its contents spilled out. A tooth on the lift bucket also broke off. One of the workers went to search for the tooth that had broken off and found a human bone inside the contents of the septic tank. The workers called the police, and more bones were recovered from the contents of the septic tank. Those bones consisted of a human head, jaw, arms, hips, ribs, and vertebrae. DNA testing showed that the bones were the remains of Betty Howery.

Along with Betty's remains, police found a .38-caliber double-barreled derringer handgun, whose partially visible serial number matched part of the serial number of a .38-caliber derringer that belonged to Betty. The bottom barrel contained an expended cartridge while the top barrel contained what appeared to be a live round. Donna later testified that Howery carried a small gun when she met him. After Betty disappeared, Howery told Donna that he finally found a derringer to replace one that he had "got rid of a while back."

Howery was arrested and charged with first-degree murder. After a four-day trial, a jury found Howery guilty of first-degree murder. The trial court entered judgment accordingly and sentenced Howery to life imprisonment without the possibility of parole. This appeal follows.

<u>Points on Appeal</u>

In his first point on appeal, Howery claims that the trial court erred in overruling his motion for judgment of acquittal at the close of all the evidence, accepting the jury's verdict of guilty of first-degree murder, and entering judgment and sentence because the evidence was insufficient to prove that Howery murdered Betty. In his second point on appeal, Howery similarly argues that the trial court erred in overruling his motion for judgment of acquittal at the

6

close of all the evidence, accepting the jury's verdict of guilty of first-degree murder, and entering judgment and sentence because the evidence was insufficient to prove the element of deliberation necessary to support a verdict of first-degree murder. In his third point on appeal, Howery asserts that the trial court abused its discretion in overruling his objection and allowing improper hearsay testimony. In his fourth point on appeal, Howery contends that the trial court abused its discretion in overruling his objection and allowing improper character evidence. Finally, Howery avers that the trial court abused its discretion in overruling his objection and allowing the State to introduce evidence of Howery's past bad acts.

Discussion

## I. The evidence was sufficient for the jury to find that Howery murdered Betty.

In his first point on appeal, Howery claims that the State presented insufficient evidence to prove beyond a reasonable doubt that Betty was murdered and, if she was murdered, that Howery killed her. We disagree.

Under Section 565.020, to prove a charge of first-degree murder, the State must produce evidence, either direct or circumstantial, that (1) defendant caused the victim's death; (2) he or she did so knowingly; and (3) he or she did so after deliberation. Section 565.020. In evaluating the sufficiency of the evidence, this Court is limited to a determination of whether there was sufficient evidence presented at trial from which a reasonable juror could have found the defendant guilty beyond a reasonable doubt. State v. Nash, 339 S.W.3d 500, 509 (Mo. banc 2011); State v. Page, 309 S.W.3d 368, 375 (Mo. App. E.D. 2010). "This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder 'could have found the essential elements of the crime beyond a reasonable doubt.'"

7

Nash, 339 S.W.3d at 509 (quoting State v. Bateman, 318 S.W.3d 681, 686–87 (Mo. banc 2010)). We accept as true all evidence and inferences favorable to the State and reject all evidence and inferences to the contrary. State v. Strong, 142 S.W.3d 702, 717 (Mo. banc 2004). We also give circumstantial evidence the same weight as direct evidence. State v. Jordan, 404 S.W.3d 292, 298 (Mo. App. E.D. 2012). When reviewing the sufficiency of evidence supporting a criminal conviction, this Court does not act as a "super juror" with veto powers, but gives great deference to the trier of fact. State v. Chaney, 967 S.W.2d 47, 52 (Mo. banc 1998).

A.     The evidence was sufficient to support a finding that Betty was murdered.

Howery first asserts that the State failed to present sufficient evidence to prove that Betty's death was a homicide and not an accident. Howery essentially argues that the State failed to meet its burden of establishing the *corpus delicti*.

The *corpus delicti* in a homicide case consists of two elements: (1) proof of the death of the victim and (2) evidence that the criminal agency of another was the cause of the victim's death. State v. Edwards, 116 S.W.3d 511, 544 (Mo. banc 2003). The *corpus delicti* must be proved by legal evidence sufficient to show that the crime charged has been committed by *someone*. State v. Madorie, 156 S.W.3d 351, 353 (Mo. banc 2005). "These factors may be shown by circumstantial evidence, but are not established until it has been proved that the death was not self-inflicted nor due to natural causes or accident." Edwards, 116 S.W.3d at 544.

Here, the State presented sufficient evidence from which a reasonable juror could conclude that Betty's death was caused by the criminal agency of another. At trial, the State produced evidence from the medical examiner, Dr. Case, who examined Betty's remains. Dr. Case testified that Betty sustained five fractures to the skull that occurred at or near the time of her death. Dr. Case further testified that, because of the locations of the fractures, they were not

8

the type of injuries that someone would sustain from falling down. Dr. Case testified that fracturing the skull takes a significant amount of force, and that the fractures on Betty's skull could have been from blunt trauma such as one or more blows to the head or a gunshot wound. Dr. Case concluded that the cause of Betty's death was homicidal violence with blunt trauma to the head. Dr. Case stated that it was her belief that Betty did not die from a natural cause, suicide, or an accident, but that she was killed in a violent way.

Based on this evidence, the jury was entitled to reject the proposition that Betty's death was an accident and to draw the inference from Dr. Case's testimony that Betty was murdered by blunt force trauma to her head. Accordingly, the State presented sufficient evidence for the jury to find that Betty was murdered as opposed to dying as the result of an accident.

B.      The evidence was sufficient to prove that Howery murdered Betty.

Howery further asserts that even if Betty was murdered, there was insufficient evidence to find beyond a reasonable doubt that that Howery killed her.

Circumstantial evidence and the permissible inferences from such evidence generally are sufficient to provide the necessary proof to support a conviction. State v. Candela, 929 S.W.2d 852, 868 (Mo. App. E.D. 1996). "Circumstantial evidence is evidence which does not directly prove a fact in issue, but gives rise to a logical inference that the fact exists." State v. Fitzgerald, 778 S.W.2d 689, 691 (Mo. App. E.D. 1989). While the State must prove the defendant's criminal agency beyond a reasonable doubt, that burden does not apply to every link in the chain of circumstances, but only to the whole issue. State v. Hayes, 347 S.W.3d 676, 681 (Mo. App. E.D. 2011). "A permissible inference of guilt may be drawn from the acts or conduct of a defendant, subsequent to an offense, if they tend to show a consciousness of guilt and a desire to conceal the offense or a role therein." State v. Isa, 850 S.W.2d 876, 894 (Mo. banc 1993).

Here, the State presented sufficient circumstantial evidence allowing a reasonable juror to conclude that Howery killed Betty. On the day Betty disappeared, Howery instructed Donna to take Betty's car from Betty's work without leaving her another vehicle. Later that day, Howery and Betty drove out to the farm where, by Howery's own admission, the two fought over money and his relationship with Donna. Howery then claimed to have left Betty at the farm with no means of transportation while he allegedly drove back and forth between the farm and the couple's apartment in St. Charles, taking back roads and stopping to watch the river. Outside of Howery's claim as to his route, his whereabouts were unaccounted for the rest of the evening. The next day, Howery called Betty's work to say she would be taking vacation, and he told Donna "well now it's on." Howery also assured Kinnard that Betty would no longer be bothering him.

When police searched the property for Betty, Howery did not alert them to the presence of the septic tank on the property, despite his knowledge of its location. Betty's remains were subsequently found in the septic tank. The evidence at trial established that Betty was killed either by blunt force trauma or by a gunshot fired from a larger-caliber weapon, and a .38-caliber derringer containing an expended round was buried with Betty's body. Donna testified that she had seen Howery carrying a small gun around before the murder, and Howery later told Donna that he found a derringer to replace the one he "got rid of."

The State also established a motive for Howery to kill Betty. The couple had received more than $200,000 as an insurance settlement after their home was destroyed by fire, and they fought over what to do with the money. Betty wanted to buy a new home, while Howery wanted to start a new life with his pregnant girlfriend. The State demonstrated that Howery stood to gain

10

more financially from Betty's death than by divorcing her and, in fact, ended up with all of the money and property that had been in their name jointly.

From this evidence, as well as Howery's conduct prior to and after Betty's disappearance, the jury reasonably could have inferred that Howery killed Betty, either by blunt force trauma or by shooting her, and hid her body in the septic tank in order to profit financially while starting a new life with Donna.

The State presented sufficient evidence from which a reasonable juror could conclude that Betty's death was caused by the criminal agency of another, and that Howery was the person who murdered Betty. Point One is denied.

## II. The evidence was sufficient for the jury to find that Howery killed Betty following deliberation.

In his second point on appeal, Howery asserts that the State presented insufficient evidence to prove the element of deliberation beyond a reasonable doubt. Therefore, Howery argues, his first-degree murder conviction must be reversed, and this Court must enter a judgment for second-degree murder. We disagree.

The requirement of proof of deliberation "sets first degree murder apart from all other forms of homicide." Strong, 142 S.W.3d at 717 (quoting State v. O'Brien, 857 S.W.2d 212, 217–18 (Mo. banc 1993)). "Deliberation" is defined as "cool reflection for any length of time no matter how brief." Section 565.002(3). "The deliberation necessary to support a conviction of first-degree murder need only be momentary; it is only necessary that the evidence show that the defendant considered taking another's life in a deliberate state of mind." State v. Miller, 220 S.W.3d 862, 868 (Mo. App. W.D. 2007) (citation omitted). Deliberation must ordinarily be proved through the circumstances surrounding the crime. Strong, 142 S.W.3d at 717 (citing State v. Ferguson, 20 S.W.3d 485, 497 (Mo. banc 2000)). While deliberation may be inferred,

11

the State is still required to prove deliberation beyond a reasonable doubt. Id. "Proof of deliberation does not require proof that the defendant contemplated his actions over a long period of time, only that the killer had ample opportunity to terminate the attack once it began." Id. (quoting State v. Johnston, 957 S.W.2d 734, 747 (Mo. banc 1997)). Deliberation may be inferred when there is evidence of multiple wounds or repeated blows. Id. A defendant's conduct after the murder, as well as the disposal of evidence, can also support a finding of deliberation. State v. Tisius, 92 S.W.3d 751, 764 (Mo. banc 2002).

Here, viewing the evidence in the light most favorable to the State, the jury could have found that Howery knowingly killed Betty after deliberation upon the matter. See Section 565.020; Nash, 339 S.W.3d at 509. At trial, Dr. Case testified that Betty sustained five fractures to the skull that occurred at or near the time of her death. Dr. Case then offered the following testimony:

| [PROSECUTOR]: | Tell me a little bit about these peri-mortem fractures. What kind of force would be required to cause these injuries? |
|---|---|
| [DR. CASE]: | A fracture of the skull is something that requires a significant amount of force . . . but in an individual human being we can't tell you how much force it would require to give you those injuries. But ways in which you could sustain injuries would be being struck with an object, being -- if you fell down and struck your head on something, but that would account for one area of fracture. So in this case we have fracture at the right frontal, the right temporal parietal, the left temporal, the right occipital and the left occipital. **So one of the considerations is did all of those fractures [come] from a single blow or some kind of an incident or whether there were multiple. I think it would be -- It's not possible to say with certainty how many blows might have been required to produce all of these injuries, but I don't think it's a single blow.** |
| [PROSECUTOR]: | Are these injuries the type that somebody would receive from falling down? |

[DR. CASE]:        No.  This is not something that you would see [with] the combination of these injuries.  For example, you might have either one of the fractures at the back from falling back and hitting your head, but you wouldn't have both. You might have one on either side of the head or the forehead from falling in that direction, but you would not have this multiplicity.

* * *

PROSECUTOR]:      Okay.  These injuries that, these peri-mortem injuries that we're talking about, if they were inflicted while someone was still alive could they be fatal?

[DR. CASE]:        Could they be fatal?

[PROSECUTOR]:     Yes, ma'am.

[DR. CASE]:        Yes, they could be fatal.

Although there was also evidence presented that Betty could have been killed by a gunshot, the jury was free to believe from Dr. Case's testimony that Betty suffered multiple blows to the head.  State v. Kimberley, 103 S.W.3d 850, 857 (Mo. App. W.D. 2003) (citing State v. Dulany, 781 S.W.2d 52, 55 (Mo. banc 1989)) (the fact-finder is free to determine the weight and credibility of the evidence, may draw reasonable inferences from the evidence, and may believe or disbelieve all, part, or none of the testimony of any witness).  Because deliberation may be inferred when there are multiple wounds or repeated blows, Strong, 142 S.W.3d at 717, it was reasonable for the jury to infer that Howery killed Betty after deliberation.

Additionally, the jury reasonably could have concluded that after Betty was killed, Howery dumped her body into the septic tank and covered it with dirt in an effort to conceal evidence of the crime.  Such a finding would also support the jury's finding of deliberation.  See Tisius, 92 S.W.3d at 764.

13

Giving great deference to the trier of fact, we find that the jury could have found beyond a reasonable doubt that Howery killed Betty after deliberation upon the matter.  Point Two is denied.

**III.    Howery was not prejudiced by the admission of testimony from Betty's co-worker.**

In his third point on appeal, Howery avers that the trial court abused its discretion in overruling his hearsay objection and allowing the State to introduce testimony from Meg Schaible ("Schaible"), one of Betty's co-workers.  Howery claims that the testimony was prejudicial because it implied that he was involved in the uncharged crime of arson and was the type of person to save his own possessions while allowing his wife's possessions to burn.

In order to preserve an evidentiary issue for appeal in a jury-tried case, an objection must be made upon introduction of the evidence and that objection must be reasserted as error in a motion for new trial.  State v. Gray, 347 S.W.3d 490, 502-03 (Mo. App. E.D. 2011).  An allegation of error in a motion for new trial may not be changed or broadened on appeal and must be based upon an objection made at the time of trial.  State v. Johnson, 943 S.W.2d 285, 291 (Mo. App. E.D. 1997); State v. Jones, 515 S.W.2d 504, 506 (Mo. 1974).  Allegations of error must be sufficiently definite to direct the trial court's attention to the particular acts or rulings asserted to be erroneous so that the trial court has an opportunity to correct them.  State v. Dunagan, 772 S.W.2d 844, 849-50 (Mo. App. S.D. 1989).

Here, Howery objected at trial to Schaible's testimony on the basis of hearsay.  Howery's objection was overruled.  In his motion for new trial, Howery then asserted the alleged error in his motion for new trial, but claimed that the trial court erred in overruling his objection on the basis of relevancy and that the questions called for speculation from the witness.  On appeal, Howery now claims that the trial court erred in allowing Schaible's testimony over his hearsay

14

objection. Because Howery's motion for new trial incorrectly directed the trial court to a ruling

it did not make, Howery did not did not provide the trial court the opportunity to correct any

mistake that it may have made at trial on the basis of hearsay. Consequently, Howery's point is

not preserved for appellate review, and is eligible only for plain error consideration. See

Dunagan, 772 S.W.2d at 849-50.

Under plain error review, Howery must demonstrate that the trial court committed an

error which is "evident, obvious, and clear" and that such error resulted in a "manifest injustice

or miscarriage of justice." Rule 30.20[2]; State v. Roper, 136 S.W.3d 891, 900 (Mo. App. W.D.

2004). If Howery carries the burden of producing an error that facially produced manifest

injustice or a miscarriage of justice, we will consider whether the claimed error did in fact cause

manifest injustice or a miscarriage of justice. Roper, 136 S.W.3d at 900. "To find manifest

injustice, we must find that the trial court's error in admitting the evidence was outcome

determinative." State v. Irby, 254 S.W.3d 181, 192 (Mo. App. E.D. 2008).

At trial, Schaible testified that Betty was very upset about their house burning down and

losing all of her possessions. The prosecutor asked Schaible whether Betty had indicated

anything unusual about the possessions that were lost in the fire. Howery objected to Schaible's

testimony on the basis of hearsay, which was overruled by the trial court. Schaible then testified:

"And I said did he lose all his guns in the fire and she said no, he had moved them to an out

building away from the fire so he didn't lose any of his possessions."

On appeal, Howery claims that this statement by Schaible constituted hearsay and thus

his objection at trial should have been sustained. Hearsay is an "out-of-court statement that is

used to prove the truth of the matter asserted and that depends on the veracity of the statement

---

[2] All rule references are to Mo. R. Crim. P. (2010).

15

for its value." State v. Taylor, 298 S.W.3d 482, 492 (Mo. banc 2009) (quoting State v. Kemp, 212 S.W.3d 135, 146 (Mo. banc 2007)). Hearsay generally is excluded by courts because "the out-of-court statement is not subject to cross-examination, is not offered under oath, and is not subject to the fact finder's ability to judge demeanor at the time the statement is made." Id. (quoting Bynote v. Nat'l Super Markets, Inc., 891 S.W.2d 117, 120 (Mo. banc 1995)). "Exceptions to the general prohibition against hearsay may apply when circumstances assure the trustworthiness of the declarant's statement." Id.

Schaible's testimony constituted hearsay because it was an out-of-court statement made by Betty that was used to prove the truth of the matter asserted – that Howery moved his guns to an outbuilding away from the fire so as to not lose his possessions. The State offers no exception under which the hearsay testimony offered by Schaible would be permissible. Thus, the trial court improperly admitted the hearsay testimony over Howery's objection.

Because the trial court committed an evident, obvious, and clear error, we must now determine whether that error resulted in a manifest injustice or miscarriage of justice. See Rule 30.20. Howery asserts that the admission of Schaible's testimony was prejudicial because it raised the implication that Howery was involved in the uncharged crime of arson and was the type of person who would save his own possessions while allowing Betty's possessions to burn.

While we are sympathetic to Howery's argument, we fail to see how the admission of Schaible's testimony was outcome determinative. Schaible's testimony went to a matter that was collateral to the State's case, in that it was not an essential element of first-degree murder that the State was required to prove. See State v. Cable, 207 S.W.3d 653, 661 (Mo. App. S.D. 2006). The State did not rely on the testimony to prove its case and made no mention of the testimony during closing argument. Moreover, there was substantial, properly admitted evidence linking

16

Howery to the murder outside of Schaible's testimony. "Where substantial corroborating evidence is properly admitted at trial, a trial court's admission of hearsay does not amount to plain error." Id. (quoting State v. Norman, 178 S.W.3d 556, 561 (Mo. App. W.D. 2005). Considering the record as a whole, we do not find that Howery was prejudiced by Schaible's testimony such that he suffered a manifest injustice or miscarriage of justice. Point Three is denied.

**IV. Howery was not prejudiced by the admission of testimony from Howery's former business partner that Howery was "crooked."**

In his fourth point on appeal, Howery asserts that the trial court abused its discretion in overruling his objection and allowing Kinnard to testify that Howery was "crooked." Howery claims such testimony was an attack on Howery's character, and that he had not placed his character or reputation in issue. Howery also contends that the admission of such testimony was prejudicial in that it was given the implied judicial imprimatur of the trial court and could have influenced the jury's view of Howery's testimony.

A trial court has considerable discretion in deciding whether to admit evidence at trial. Madorie, 156 S.W.3d at 355. We give great deference to the trial court and review its ruling as to the admission of evidence only for an abuse of discretion. Id. We presume that the trial court's finding is correct, and will reverse only when it makes a ruling that is "clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." Kemp, 212 S.W.3d at 145. However, even if we find an abuse of discretion, we will not reverse unless we also find that the trial court's error is "so prejudicial that it deprived the defendant of a fair trial." Id. Error is not prejudicial unless there is a reasonable probability that it affected the outcome of the trial. Id. at 145-46. The burden is on the defendant to show both the error and the resulting prejudice. State v. Clark, 747 S.W.2d 197, 200 (Mo. App. E.D. 1988).

17

Character evidence is evidence "that concerns a person's reputation, such as whether someone in the defendant's community views the defendant as a law-abiding citizen, a peaceable person, a truthful person, or as having any other general character trait." State v. Shockley, 410 S.W.3d 179, 193 (Mo. banc 2013). Generally, the prosecution may not attack the character of the accused unless the accused first puts it in issue by offering evidence of his good character. State v. Teal, 624 S.W.2d 122, 125 (Mo. App. E.D. 1981).

At trial, Kinnard testified that sometime after closing on the property he was jointly purchasing with Howery and Betty, Howery told Kinnard that Betty would not be bothering him anymore. Kinnard testified that after that conversation, he never saw Betty again. The State then attempted to elicit testimony from Kinnard as to whether he approached police with Howery's statement or whether the police approached Kinnard. The following exchange took place at trial:

| [PROSECUTOR]: | Okay. Now, you didn't voluntarily go to the police and tell them this in 1992; did you? |
|---|---|
| [KINNARD]: | No. |
| [PROSECUTOR]: | How was it that you came to tell some law enforcement officers about these statements? |
| [KINNARD]: | Well, after being in business with him for a few years I realized how crooked he was. |
| [DEFENSE]: | Objection, your Honor. May we approach? |
| [THE COURT]: | No, there's no point in that. Overruled. Go ahead. |
| [PROSECUTOR]: | I guess my question is more did you go to law enforcement or did they come and talk to you? |
| [KINNARD]: | Truthfully I don't remember. |

Because the defense had not put forth evidence of Howery's good character, it was error for the trial court to overrule Howery's objection to Kinnard's testimony that he was "crooked." However, even if the trial court should have sustained Howery's objection, Howery has failed to meet his burden of proving that he was prejudiced by the admission of Kinnard's testimony such that it affected the outcome of the trial. Howery claims that the overruling of his objection gave Kinnard's testimony that Howery was "crooked" the implied judicial imprimatur of the trial court and could have influenced the jury's view of Howery's later testimony. We are not persuaded.

Although the trial court overruled Howery's objection to Kinnard's characterization of Howery as "crooked," we do not agree with Howery's claim that this constituted judicial imprimatur. The trial court was merely making a ruling as to whether it believed the evidence was admissible at trial. Moreover, Kinnard's reference to Howery being "crooked" was brief and unsolicited, and thus "an isolated incident of minimal consequence in the course of a long trial." Clark, 747 S.W.2d at 201. In light of the entire record, we fail to see how Kinnard's one-word description of Howery was so prejudicial that it affected the outcome of the trial.

Point Four is denied.

## V. Howery was not prejudiced by the admission of testimony from Betty's son that Howery physically abused him and Betty.

Howery's final point on appeal challenges the trial court's admission of testimony that Howery hit Betty and her son. Howery claims the testimony relating to his past bad acts was improper because his character was not at issue. Howery also asserts that the testimony was more prejudicial than probative and only served to divert the jury's attention and inflame the passions of the jury.

At trial, the State called Higginbotham as its first witness. Prior to Higginbotham taking the stand, defense counsel renewed an objection made in a motion in limine to any evidence of prior bad acts that were unrelated to Betty's murder. The prosecutor explained that any evidence would be offered not to show Howery's propensity to commit the crime, but to establish motive, intent, and lack of mistake. The trial court noted that the evidence would be admissible for that purpose, but granted Howery a continuing objection. The State then elicited the following testimony from Higginbotham regarding why he was concerned for his mother when she missed work and her father's birthday party:

[PROSECUTOR]: What were your concerns?

[HIGGINBOTHAM]: My concerns were Doug had done something to her.

[PROSECUTOR]: And why would you say that?

[HIGGINBOTHAM]: Their relationship had always been somewhat rocky. I'll leave it at that.

[PROSECUTOR]: Well, explain that to me, what somewhat rocky means to you.

[HIGGINBOTHAM]: Explosive. They would go for periods of time and things would be okay and then if they got in a fight when I actually lived in the trailer there were very heated exchanges, physical exchanges.

[PROSECUTOR]: And when you say physical I mean tell me what you personally saw.

[HIGGINBOTHAM]: I've seen my mother get hit. I know for a fact my mother's tooth was chipped because she was thrown into a dining or living room table. Frankly I was hit.

Higginbotham further testified that the time period wherein he witnessed his mother being hit by Howery was between 1980 and 1982.

20

In general, evidence of uncharged misconduct is inadmissible for the purpose of showing the defendant's criminal character or propensity to commit such crimes. State v. Young, 367 S.W.3d 641, 645 (Mo. App. E.D. 2012) (citing State v. Bernard, 849 S.W.2d 10, 13 (Mo. banc 1993)). However, an exception exists where the evidence of the uncharged crime is both logically and legally relevant. Id. Such evidence is logically relevant if it has "some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial," and such evidence is legally relevant if "its probative value outweighs its prejudicial effect." Bernard, 849 S.W.2d at 13. "The balancing of the effect and value of evidence rests within the sound discretion of the trial court." Id.

Evidence of uncharged crimes has a "legitimate tendency to prove the specific crime charged" when the prosecution uses it to establish: "(1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; [or] (5) the identity of the person charged with the commission of the crime on trial." Young, 367 S.W.3d at 645. "In cases of murder or assault, prior misconduct by the defendant toward the victim is logically relevant to show motive, intent, or absence of mistake or accident." State v. Walker, 318 S.W.3d 789, 792 (Mo. App. E.D. 2010). However, such evidence is only admissible for those purposes if the defendant puts motive, intent, mistake or accident at issue in the case by admitting to the conduct but claiming it was innocent or a mistake. See State v. Tolliver, 101 S.W.3d 313, 315-16 (Mo. App. E.D. 2003). Otherwise, "the prejudicial effect of admitting the evidence is substantial." State v. Wallace, 943 S.W.2d 721, 725 (Mo. App. W.D. 1997).

Here, the State argues that Higginbotham's testimony was admissible because Howery put mistake and intent at issue in the case. The State claims that during his opening statement,

21

defense counsel raised the possibility that Betty's death was accidental and placed intent at issue by arguing that Howery's actions were inconsistent with the charge that he had intentionally killed Betty. We disagree with the State's assessment of defense counsel's opening argument. In opening argument, defense counsel told the jury that Howery did not know how, when, or where Betty died. However, Howery's denial of knowledge as to the circumstances surrounding Betty's death does not insert the issue of mistake or intent into the matter. "The denial of the act does not make intent an issue simply because it is an element of the charge." State v. Chism, 252 S.W.3d 178, 185 (Mo. App. W.D. 2008). Intent or mistake becomes an issue when the defendant admits to the conduct but claims his actions were accidental or in self-defense, neither of which Howery claims in this case. Because Howery did not insert the issue of intent or mistake into the case, we find that it was an abuse of discretion for the trial court to allow Higginbotham's testimony that Howery hit both Betty and Higginbotham.

Despite this abuse of discretion, we do not find that the trial court's error was so prejudicial that it deprived Howery of a fair trial. See Kemp, 212 S.W.3d at 145. Higginbotham testified that, 10 to 12 years prior to Betty's disappearance, he witnessed Howery hit Betty once and knew that Betty had chipped a tooth after Howery pushed her into a table. The incidents referred to by Higginbotham occurred at least a decade before Betty's disappearance. We note that no further testimony regarding these events was adduced by the State. Howery also has not shown how the testimony inflamed the jury or diverted the jury's attention from the issue at bar. In light of the other evidence presented at trial, we cannot conclude that the jury would have reached a different conclusion but for Higginbotham's testimony. Rather, Higginbotham's testimony was but "an isolated incident of minimal consequence in the course of a long trial." Clark, 747 S.W.2d at 201.

Point Five is denied.

## Conclusion

We acknowledge that our holding in this case recognizes three evidentiary errors. We do not take these errors lightly and have carefully considered both the individual and cumulative impact of these errors on the judgment. Upon thorough and thoughtful analysis, we conclude that these evidentiary errors were not prejudicial to Howery. We are not persuaded that the jurors would have rendered a different verdict had this evidence been excluded. Given the limited nature or remoteness in time of the evidence erroneously admitted, the impact of such evidence was inconsequential when viewed against the entirety of the record. Accordingly, we affirm the judgment of the trial court.

_____
Kurt S. Odenwald, Judge

Mary K. Hoff, P.J., Concurs
Angela T. Quigless J., Concurs

23