

# In the Missouri Court of Appeals
# Eastern District

**DIVISION FOUR**

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED110819 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| v. | ) | Cause No. 19SL-CR06842-01 |
| | ) | |
| BEAU ROTHWELL, | ) | Honorable Ellen H. Ribaudo |
| | ) | |
| Appellant. | ) | Filed: May 14, 2024 |

After hitting his pregnant wife in the head with a rubber mallet, Beau Rothwell abandoned her naked body in a wooded area a little under an hour away from their home. Rothwell testified at trial that he killed his wife in a fit of rage. A jury found Rothwell guilty of first-degree murder, tampering with evidence, and abandonment of a corpse. The circuit court sentenced Rothwell to life in prison without parole for the murder and four years' each for the remaining two charges, one term of which was to run consecutive to the life sentence and the other to run concurrently. This Court affirms the circuit court's judgment.

## Factual and Procedural Background

Rothwell and Wife married in 2015. They had an outwardly happy marriage, and in 2018, the couple began trying to start a family. According to Rothwell, they had difficulty conceiving, and these struggles strained their marriage.

In spring 2019, Rothwell began an affair with Mistress. Throughout the affair, Rothwell expressed his frustrations with his marriage to Mistress. In numerous messages sent through a social media messaging app, Rothwell and Mistress expressed their love for one another and their disappointment that Rothwell was married.

On October 26, 2019, Wife told Rothwell that she was pregnant. The next day, Rothwell messaged Mistress and attempted to end their relationship. Rothwell told Mistress that he had thought about divorcing Wife for two to three months before he met Mistress and that he thought he "would have had the courage to go through a divorce by now."

Two days later, Rothwell resumed messaging Mistress. Mistress expressed that she missed Rothwell, and Rothwell revealed that he attempted to end their relationship because his wife was pregnant. Rothwell told Mistress that he wanted to be with her instead of Wife. While messaging, Rothwell expressed significant regrets about the pregnancy to Mistress. He told her that he regretted not ending his marriage before the pregnancy, that he did not want the pregnancy, and called himself a coward for not having ended his marriage sooner. In one message, Rothwell stated, "This is the last thing I want. I've never felt more regretful for anything in my entire life," and "part of me wants this pregnancy to not work out."

On October 30, 2019, Rothwell messaged Mistress again, stating:

> The way I see it, we have three options. Number one, say goodbye to each other and move on. We need to cut each other off, otherwise we're never going to let go. Number two, I tell [Wife] that I've been having an affair and want a divorce. Then I have to let her decide if she wants to keep the child or not. If she does, I will respect that and have to give up a lot of my time and money supporting this kid while trying to start a life with you. Number three, wait and see how the pregnancy goes; if there's a miscarriage or something, I'll leave her after that and be with you.

When Mistress asked Rothwell which option he preferred, Rothwell responded, "I guess 3, if I'm being selfish …."

While having these conversations with Mistress, Rothwell continued to plan for the baby's arrival with Wife. Wife and Rothwell discussed decorating a nursery, purchased supplies for a photographic calendar to document the baby's growth throughout the pregnancy, and researched new health insurance plans. Yet, Wife was uncertain of Rothwell's commitment and searched the internet for topics such as "husband doesn't care," first pregnancy forums, and "7 Secrets Your Husband Doesn't Want to Tell You About Your Pregnancy."

Meanwhile, Rothwell and Mistress continued their relationship. On November 1, when Mistress expressed her fear that their relationship may be over, Rothwell replied he did not want to end the relationship and needed her in his life. On November 2, Rothwell and Mistress met and had sex. The next day, Mistress asked Rothwell if he loved her, and Rothwell confirmed that he did. On November 4, their messaging revealed that Rothwell and Mistress discussed their relationship options and decided to wait and see how the pregnancy progressed before making any decision. Mistress expressed concern that Rothwell did not care enough for her to leave Wife, to which Rothwell replied that the problem was that he did not have the courage to ask for a divorce earlier. They ended their conversation by expressing love for one another. The following day, Rothwell told Mistress, "I'm addicted to you." On November 10, Mistress told Rothwell that she wanted to see him the next weekend, to which Rothwell responded, "I wanna see you too. I'll see what I can do."

In the early morning hours of November 11, Rothwell rebooted the Wi-Fi router in the home, erasing data logs stored on the router, particularly records of devices that were connected to the router. Later that day, Rothwell messaged Mistress and told her that he had trouble sleeping the night before because he had a lot on his mind and could not get comfortable. He told Mistress that "it was just about our situation. Really I was stressing more about the other side of

3

that." Rothwell and Mistress continued to message one another throughout the day. At 9:04 p.m. on November 11, Rothwell sent Mistress a message stating, "I'm not feeling well, I think it's the lunch I had earlier. I'm gonna go to bed early. Sweet dreams darling, I love you."

However, surveillance footage showed Rothwell at a local grocery store between 9:12 p.m. and 9:23 p.m. that same night. A receipt from 9:22 p.m. shows that Rothwell purchased paper towels, bleach, and rug cleaner. A second receipt showed that Rothwell returned to the store around 11:00 p.m. to purchase additional items, which Rothwell later identified as nitrile gloves.

Sometime in the evening of November 11 or early morning of November 12, Rothwell killed Wife. According to Rothwell, while he and Wife were in the kitchen, Rothwell grabbed a rubber mallet, walked behind Wife, and struck her in the right temple. Wife began to bleed profusely, and she stumbled out of the chair and attempted to run from Rothwell. Rothwell pursued and caught Wife, preventing her from leaving. The couple struggled at the top of the basement stairwell, where Rothwell again struck Wife in the head with the mallet. As a result of the blow, Wife fell down the stairs, unconscious and unresponsive.

Around 2:00 a.m., Rothwell undertook to dispose of Wife's body. Rothwell taped a plastic bag over Wife's head and placed her body on a tarp in the bed of his truck. He gathered the cleaning supplies he used to clean his home, put them in a trash bag, and put it in the bed of his truck. Rothwell drove for forty-five or fifty minutes to a remote area where he did not think that anyone would stop. He pulled over and dumped Wife's body in the brush. Rothwell removed Wife's clothing and added it to the trash bag in his truck bed. Rothwell then covered her body with sticks. He then got back in his truck and began to drive home. On his way, he

stopped at a business that did not seem to have security cameras to dispose of the evidence in their dumpster.

Rothwell arrived home and continued cleaning. Around 6:30 a.m., he drove Wife's car a few minutes down the route she took to work. He pulled over on the side of the road to make it look like she had "stalled … or skidded off the road." Wife's phone was in the car, so Rothwell called his own phone from Wife's phone to make it appear that she called him for help. He left Wife's phone in the car and walked home.

Rothwell went to work that morning but came home early. He texted Wife's phone several times to "appear normal." In the texts, he asked where Wife was, if she was running late coming home from work, and if she was bringing back dinner. Rothwell also sent messages to Mistress that day, including one calling her "babycakes." Around 8:30 or 8:45 p.m., Wife's coworker reached out to Rothwell because Wife failed to come into work. Rothwell told the coworker he had not heard from Wife. Shortly after this conversation, Wife's friends, family, and coworkers launched a search for Wife. Rothwell actively participated in this search.

On November 13, 2019, Rothwell was arrested for Wife's murder. After his arrest, Rothwell's employer fired him. A colleague went through Rothwell's cubicle and found a "pro-con" list that Rothwell wrote in July 2019, regarding his relationships with Wife and Mistress. The list included a "benefits" heading, which was interpreted as the benefits of leaving Wife for Mistress. The "benefits" list included "better sex life, more resp. [*sic*], more appreciative, a proven mother, and potentially nice fam. [*sic*]." Following this list, Rothwell wrote, "is the <u>cost</u> too high?" (emphasis added). Under the "negatives" portion of the list, Rothwell wrote "probably limit one kid, [Wife] and her family, have to move, half my assets/money, [lose] most if not all

5

my friends, trust is shaken/tainted, my family's disappointment, and take on [Mistress's] kid with his problem."

Rothwell testified at trial that he did not plan to murder his wife, but instead, he had done so while angry and in a "red haze." According to Rothwell, at some point in the evening of November 11, Rothwell decided to tell Wife about his affair with Mistress, believing this was his "chance to salvage" part of their relationship. During the conversation, Wife became upset and questioned Rothwell. Wife asked who the other woman was, but Rothwell refused to tell her. In response, Wife told Rothwell that she was also having an affair, and that the baby probably did not belong to him.[1] Rothwell testified that he became "very upset" with Wife as a result of her reported affair. He stood up from the kitchen table where the two were sitting, and saw a mallet that he had recently used to hang decorations. He took the mallet in his hand, and while standing behind Wife, struck her in the right temple while she remained sitting. Wife began to move toward the garage door, and Rothwell ran after her. The two struggled at the top of the stairs. Rothwell struck her again, causing her to lose consciousness and fall down the stairs.

After hearing all of the evidence, the jury found Rothwell guilty of one count of murder in the first-degree, one count of tampering with physical evidence, and one count of abandonment of a corpse. Rothwell appeals, raising three claims of error.

## Analysis

### *Sufficiency of the Evidence*

Rothwell claims the circuit court erred in finding there was sufficient evidence of deliberation. Rothwell argues the evidence both before and after the murder was insufficient to prove he deliberated.

---

[1] A paternity test performed after the murder revealed that Rothwell was the father.

"When considering the sufficiency of the evidence on appeal, this Court must determine whether sufficient evidence permits a reasonable juror to find guilt beyond a reasonable doubt." *State v. Boyd*, 659 S.W.3d 914, 925 (Mo. banc 2023) (quoting *State v. Belton*, 153 S.W.3d 307, 309 (Mo. banc 2005)). This Court "does not act as a 'super juror' with veto powers, but gives great deference to the trier of fact." *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011). "The evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict." *State v. Minor*, 648 S.W.3d 721, 736 (Mo. banc 2022) (quoting *State v. Stewart*, 560 S.W.3d 531, 533 (Mo. banc 2018)).

"The State must prove every element of a crime charged beyond a reasonable doubt." *State v. Lehman*, 617 S.W.3d 843, 847 (Mo. banc 2021). The elements of murder in the first degree are that a person: (1) knowingly (2) caused the death of another person (3) after deliberation on the matter. Section 565.020.1, RSMo 2016. Rothwell argues that the State's evidence of his actions before and after causing Wife's death are insufficient to allow a jury to find the element of deliberation. Notably, Rothwell's argument omits all of the evidence and inferences of deliberation that occurred while he murdered Wife. Deliberation is defined as "cool reflection for any length of time no matter how brief[.]" Section 565.002(5), RSMo Supp. 2017.

"Direct proof of a required mental state is seldom available, and the mental state may be proved by indirect evidence and inferences reasonably drawn from the circumstances surrounding the slaying." *State v. Johns*, 34 S.W.3d 93, 110 (Mo. banc 2000). There is sufficient evidence in this case for a reasonable jury to find Rothwell acted after deliberation.

Rothwell's actions while in the act of killing Wife sufficiently proved deliberation. Rothwell retrieved a mallet and walked behind Wife while she was sitting at their kitchen table.

7

Rothwell then used the mallet to strike Wife in the head with sufficient force to draw blood. Wife got up and attempted to flee from Rothwell. She ran toward the garage to escape, but Rothwell pursued her and caught her. They struggled at the top of the basement stairs. Rothwell hit Wife in the head again with the hammer. Rothwell only stopped once Wife was laying on the basement floor, bloodied and not moving.

"Intent to kill or inflict serious bodily injury can be inferred from the use of a deadly weapon on some vital area of the victim's body." *State v. Goodwin*, 43 S.W.3d 805, 816 (Mo. banc 2001). An inference of deliberation is supported "when there are multiple wounds or repeated blows." *State v. Glass*, 136 S.W.3d 496, 514 (Mo. banc 2004). Striking a person "in the head with a hammer multiple times demonstrates intent to kill or inflict serious injury." *Goodwin*, 43 S.W.3d at 816.

Rothwell also had an opportunity to end his attack after it began. *State v. Strong*, 142 S.W.3d 702, 717 (Mo. banc 2004) (finding deliberation does not require a particular amount of time and can be found when there was an opportunity to terminate the attack). After Rothwell struck Wife in the head the first time, he could have stopped his attack. However, he chose to chase her, struggle with her, and attack Wife again before killing her. There was sufficient evidence at trial to support Rothwell's deliberation for first-degree murder.

Additionally, "[e]vidence of multiple … wounds, repeated blows, the failure to seek medical help, a prolonged struggle, ample opportunity to stop the attack, or that the defendant brooded over his actions before taking them can support an inference of deliberation." *State v. Shaddox*, 598 S.W.3d 691, 696 (Mo. App. 2020) (quoting *State v. Olivas*, 431 S.W.3d 575, 580 (Mo. App. 2014)). Here, Rothwell hit Wife with the mallet multiple times, he did not render her aid, he chose to chase and struggle with her before inflicting the killing blow, and the messages

sent to Mistress indicated he was brooding over his actions. *See also Glass*, 136 S.W.3d at 514 (noting "[d]eliberation may also be inferred when there are multiple wounds or repeated blows") and *State v. Tisius,* 92 S.W.3d 751, 764 (Mo. banc 2002) (noting deliberation may be inferred from "multiple wounds, or repeated blows").

Additionally, Rothwell's conduct after murdering Wife supports deliberation. Post-murder "actions can display a consciousness of guilt and remove any doubt the defendant had not intended to complete the killing." *State v. Gomez*, 672 S.W.3d 113, 121 (Mo. App. 2023). A defendant's attempt to dispose of evidence can support an inference of deliberation. *State v. DeRoy*, 623 S.W.3d 778, 786 (Mo. App. 2021). *See also State v. Howery*, 427 S.W.3d 236, 247 (Mo. App. 2014) (noting dumping the victim's body in a septic tank and covering it with dirt to conceal evidence demonstrates deliberation) and *Tisius*, 92 S.W.3d at 764 (deliberation inferred from multiple gunshot wounds and disposal of murder weapon). Rothwell cleaned the murder scene, removed Wife's body, attempted to conceal it in the woods, disposed of evidence, and then attempted to change the timeline of events by moving Wife's car and texting her phone as if he had done nothing wrong.

All of this evidence is on top of the evidence demonstrating that Rothwell was a man who was dissatisfied with his marriage, in love with another woman, and feeling further trapped into his marriage by his wife's recently discovered pregnancy. Rothwell's relationship with Mistress continued through the day of trial where Rothwell testified that he continued to speak with Mistress nearly every day.

A jury is not compelled to find deliberation. *State v. Johns*, 34 S.W.3d 93, 111 (Mo. banc 2000). However, there was ample evidence presented in this case to allow the jury to draw an inference of deliberation.

9

*Closing Argument*

Rothwell argues the circuit court erred in allowing the State to argue during closing argument that Rothwell's post-murder actions were evidence of deliberation. Rothwell argues that the State's argument confused the jury on the issue of deliberation and consciousness of guilt because it did not comply with the legal definition of deliberation.

"The State has wide latitude in closing arguments, but closing arguments must not go beyond the evidence presented; courts should 'exclude statements that misrepresent the evidence or law, introduce irrelevant prejudicial matters, or otherwise tend to confuse the jury.'" *State v. Deck,* 303 S.W.3d 527, 543 (Mo. banc 2010) (quoting *State v. Rush*, 949 S.W.2d 251, 256 (Mo. App. 1997)). "Misstatements of law are impermissible during closing arguments, and the [circuit court] has a duty to restrain such arguments." *State v. Anderson*, 306 S.W.3d 529, 543 (Mo. banc 2010) (quoting *State v. Blakeburn*, 859 S.W.2d 170, 174 (Mo. App. 1993)). "Closing arguments must be examined in the context of the entire record." *Id*.

During its closing argument, the State argued:

[A]nd all of [Rothwell's] actions afterwards prove deliberation, too. This was not some pause in an event. This is ongoing for the defendant. Innocent people don't go to the extent that he did. That's someone who has deliberated. And all of his deliberation afterwards is him in the same act of murdering [Wife] and attempting to get away with it. All of it.

As previously explained, deliberation may be supported by a defendant's conduct after a murder. *Tisius,* 92 S.W.3d at 764. The circuit court did not abuse its discretion in allowing the State's closing argument discussion about evidence which created an inference of deliberation.

*Admission of Photographs*

Rothwell claims the circuit court erred in admitting three photographs into evidence because the photographs were unduly prejudicial, unnecessary to prove disputed facts, and

cumulative. Specifically, Rothwell objected to several photographs that showed evidence of postmortem animal scavenging as well as the wounds Rothwell caused to Wife's skull. Rothwell argues admission of these photographs was merely to inflame the jury and served no discernible evidentiary purpose.

The circuit court is vested with broad discretion in determining whether to admit photographs. *Kappel v. Prater*, 599 S.W.3d 189, 193 (Mo. banc 2020). Photographs may be admissible "if they depict the crime scene, the victim's identity, the nature and extent of the wounds, the cause of death, the condition and location of the body, or otherwise constitute proof of an element of the crime or assist the jury in understanding the testimony." *State v. Wood*, 580 S.W.3d 566, 575 (Mo. banc 2019) (quoting *State v. Collings*, 450 S.W.3d 741, 762 (Mo. banc 2014). "[A] photograph should not be excluded from evidence unless its prejudicial effect outweighs its probative value." *State v. Martin*, 682 S.W.3d 138, 141 (Mo. App. 2024) (quoting *State v. Sperling*, 353 S.W.3d 381, 383 (Mo. App. 2011)). "Insofar as photographs tend to be shocking or gruesome, it is almost always because the crime is shocking or gruesome." *State v. Rousan*, 961 S.W.2d 831, 844 (Mo. banc 1998).

The admitted photographs depict portions of wife's skull, jaw, and teeth that were exposed by animals that scavenged on Wife's body after Rothwell abandoned it in the woods. The photographs also clearly show the wounds inflicted by Rothwell during the murder.

The photographs are graphic, but they also are probative. The photographs provide proof of Wife's identity, the condition and location of Wife's body, and the severity of the injuries she sustained. The witnesses that testified about the photographs, including the medical examiner, delineated which injuries were caused by Rothwell, and which were caused by scavengers. *See Collings*, 450 S.W.3d at 762-63 (finding no error in admission of crime scene photographs

11

depicting the state of the victim's body in a sinkhole) and *State v. Brumfield*, 673 S.W.3d 820, 824 (Mo. App. 2023) (finding no error in admission of autopsy photographs that showed the condition of the victim's body and assisted the jury in understanding expert medical testimony). The photographs' graphic nature reflects Rothwell's extreme actions in killing Wife and moving her body to a remoted wooded location. Because they were relevant and not unduly prejudicial, the circuit court did not err in admitting these photographs.

## Conclusion

The circuit court's judgment is affirmed.

_____
John P. Torbitzky, P.J.

James M. Dowd, J., and
Michael S. Wright, J., concur.

12