Factual Background[3]
Conaway has a biological son (the "Victim"), who was twelve years old in May 2015. At the time, Conaway no longer had legal custody of the Victim, and the Victim had not seen Conaway "in a few years." The Victim was in the care of Conaway's former girlfriend, Tammy Clavelle.
On May 16, 2015, at approximately 8:00 a.m., Conaway awoke the Victim at Clavelle's home, and told him to get up because they were going to church. Clavelle objected to Conaway taking the Victim and, after they left the house, she called 9-1-1 and followed Conaway and the Victim in her truck.
Officers Terrence Brown and Jeremy Buske were dispatched to respond to the scene. When they arrived, they encountered Clavelle. She pointed to Conaway and the Victim, who were walking in a nearby parking lot. She explained to the officers that she was the Victim's custodian, and that he had been taken by his father, who was not supposed to have the child.
The officers called out to Conaway to stop. Instead of stopping, Conaway "picked up the pace, like a fast walk, actually leaving [the Victim] walking away." As the officers continued to demand that Conaway stop, he continued walking away, and called the Victim "to come to him." The Victim appeared confused, because the officers were calling him to come to them, while Conaway was calling him in the opposite direction. Ultimately the Victim went to Conaway. Conaway grabbed the Victim's arm and picked up his pace moving away from the officers, telling them that they would not get the Victim, and that if they wanted to take him, they would have to take the Victim.
Both officers testified that as they approached, Conaway grabbed the Victim and "cradle[d] him underneath his arms[,] [a]nd at the same time start[ed] to reach in his pocket as if he had a weapon." At this point, the officers drew their guns. Conaway told the officers to go ahead and shoot him, while holding the Victim "up high, kind of using him to shield himself." After *376 Conaway "fumbl[ed] around" in his pocket for a while, the officers concluded that he did not have a gun. The officers holstered their firearms, and Officer Brown instead drew his Taser.
When Officer Brown pointed the Taser at Conaway, "[Conaway] took [the Victim] and started trying to shield himself with [the Victim]." Officer Buske testified, "[Conaway] had [the Victim] immediately in front of him with his arm wrapped around [the Victim] and [Conaway] was holding [the Victim] directly in front of him." Conaway continued to ignore the officers' commands to let the Victim go. Officer Brown "tried to kind of encircle [Conaway] and tr[ied] to come at a different angle[,] [a]nd he would just turn with the child." Officer Brown testified that Conaway adjusted his hold on the Victim "trying to eliminate us from having anywhere to deploy the Taser on him."
Ultimately, Officer Brown walked up to Conaway and shocked him in the face or neck, which was "the safest location possible to deploy the Taser where the child would not be in any danger." Upon being tased, Conaway immediately dropped the Victim, and the officers took Conaway into custody. The officers later discovered that at least one of the prongs of the Taser had shocked the Victim, despite Officer Brown's efforts to use the device solely on Conaway.
A recording from the police vehicle's dashboard camera was admitted into evidence and played for the jury. The camera did not capture video of the officers' interaction with Conaway, because of the direction the patrol car was pointing. On the audio, Conaway can be heard repeatedly stating, "You take me, you take him." The dashboard camera's recording indicates that the entire incident, from the officers' arrival at the scene until their restraint of Conaway, lasted approximately 90 seconds.
Conaway was charged with the class A felony of kidnapping, in violation of § 565.110 (Count I); the class C felony of endangering the welfare of a child in the first degree, in violation of § 568.045 (Count III), and the class D felony of resisting arrest, in violation of § 575.150 (Count IV).[4] Each of these counts relied on the allegation that Conaway had used the Victim as a shield as the officers were attempting to apprehend him. Thus, in Count I, Conaway was charged with kidnapping by unlawfully confining the Victim "for the purpose of using [him] as a shield." In Count III, Conaway was charged with endangering the Victim's welfare "by failing to cooperate with police commands while holding [the Victim] in front of defendant's body." In Count IV, the State alleged that, in resisting a lawful detention, Conaway "created a substantial risk of serious physical injury or death to a person in that the defendant used [the Victim] as a shield when the law enforcement officer drew his firearm."
A jury trial was held in August 2016. The prosecutor explained to the venire panel that
[e]ach element [of the charged offenses] must be proved beyond a reasonable doubt. There's no higher or lower burden with regards to each separate element. They all must be found, they all must be found beyond a reasonable doubt in order to convict for each count. Is there anyone who would hold the State to a higher burden and make us prove anything that's maybe not an element? And it's kind of confusing when I *377 say that, but like motive. Motive is why someone does something. Motive is not an element in any of the three counts that we have alleged against the defendant. Is anyone going to have trouble finding-convicting, if you have an unanswered question like why did someone do that?
Defense counsel objected to the question concerning motive. The trial court overruled the objection, but asked the prosecutor to clarify her question. The prosecutor rephrased the question by asking, "[i]s [motive] something that you would require the State to prove before you would be able to convict?" In response, three prospective jurors stated that they would hesitate to convict someone of kidnapping his or her own child; none of the venirepersons expressed concerns related to motive.
After a three-day trial, the jury found Conaway guilty of all three offenses submitted to them: kidnapping, endangering the welfare of a child in the first degree, and resisting arrest. Consistent with the charging instrument, the verdict directors for each offense relied on Conaway's act of using the Victim as a shield when officers attempted to apprehend him. Having found Conaway to be a persistent felony offender, the court imposed sentences of fifteen years on the kidnapping count, seven years for endangering the welfare of a child, and four years for resisting detention, with the sentences to run concurrently.
Conaway appeals.
Discussion
Conaway raises two arguments on appeal. He first argues that he is entitled to a new trial because the prosecutor's voir dire questioning concerning motive improperly solicited a commitment from the jury. In his second Point, Conaway argues that he is entitled to a judgment of acquittal on the kidnapping count, because the State failed to prove that he confined the Victim "for a substantial period." We reject both arguments.
I.
Conaway first argues that the trial court abused its discretion in allowing the State, over his objection, to ask prospective jurors whether they "would be able to convict" Conaway without proof of motive.
"The purpose of voir dire is to discover bias or prejudice in order to select a fair and impartial jury." State v. Clark , 981 S.W.2d 143, 146 (Mo. banc 1998). "There is no rigid formula for an adequate voir dire. Consequently, a liberal latitude is allowed in the examination of jurors, as long as the scope of voir dire remains commensurate with its purpose to discover bias or prejudice in order to select a fair and impartial jury." State v. Ousley , 419 S.W.3d 65, 73 (Mo. banc 2013) (citations and internal quotation marks omitted). "[T]he trial judge is vested with the discretion to judge the appropriateness of specific questions, and is generally vested with wide discretion in the conduct of voir dire. " State v. Baumruk , 280 S.W.3d 600, 614 (Mo. banc 2009) (citation and internal quotation marks omitted).
While counsel is entitled to conduct relatively wide-ranging voir dire examination to explore the biases of potential jurors, "[c]ounsel may not ... try the case on voir dire ...." State v. Holmquest , 243 S.W.3d 444, 451 (Mo. App. W.D. 2007).
Questions may not be phrased in such a way as to attempt to elicit a commitment from jurors how they would react to hypothetical facts or seek to predispose jurors to react a certain way to anticipated evidence. When the inquiry includes questions phrased or framed in such a manner that they require the one *378 answering to speculate on his own reaction to such an extent that he tends to feel obligated to react in that manner, prejudice can be created. The limitation is not as to the information sought but in the manner of asking.
Ousley , 419 S.W.3d at 74 (citations and internal quotation marks omitted).
State v. Manley , 414 S.W.3d 561 (Mo. App. E.D. 2013), holds that the prosecution in a criminal case is entitled to ask prospective jurors whether they would have difficulty deciding the case without evidence of motive, where motive is not an element of the underlying offense. In Manley , after explaining that motive was not an element of the charged offense, the State continued by asking:
is there anybody here that's thinking "Listen, this is a murder case. It's a criminal case. I need to know what the motive is. And if I don't know what the motive is, I can't make a decision. It's a serious case." Is there anybody here who's thinking, "I can't do that"? Anybody over here?
Id. at 569. The trial court overruled defense counsel's objection to this inquiry, and the Eastern District affirmed. The Court explained:
the prosecutor correctly stated that motive was not an element of the charged offenses and asked whether any potential jurors would, nonetheless, require evidence of motive. Neither a negative nor an affirmative answer to this question could reasonably be construed as committing a prospective juror to a particular course of action, i.e., to convict or acquit, or to give credibility and weight to the testimony of any particular witness. To the contrary, the purpose of the prosecutor's question was to determine whether the venire could follow the trial court's instructions and recognize the State's burden to prove all elements of the charges beyond a reasonable doubt.
Id. (citation and internal quotation marks omitted).
In light of Manley , Conaway admits that it is permissible for the prosecution to "ask about motive provided the question is asked in a way that cannot be construed to commit a prospective juror to either convict or acquit." In Manley , the prosecution asked jurors whether they would be able to "make a decision" if motive evidence were lacking. The Eastern District held that the prosecution's questioning did not inappropriately seek a commitment from jurors.
In this case, the prosecution asked prospective jurors whether "you would require the State to prove [motive] before you would be able to convict?" The "motive question" in this case was no more objectionable than the questioning in Manley . Asking potential jurors whether they "would be able to convict" despite the lack of motive evidence did not ask for their commitment that they would, in fact, convict Conaway if certain conditions were met. The State merely asked jurors whether the lack of motive evidence would prevent them from convicting; it did not ask whether they would necessarily convict if particular circumstances existed. The prosecution was not seeking an advance commitment; instead, "it appears that counsel was trying to find out whether any prospective juror had views which would prevent him from returning a guilty verdict in this case in any event." State v. McCaine , 460 S.W.2d 618, 622 (Mo. 1970) (prosecutor did not seek improper commitment by asking venire members "[i]f the defendant is proved guilty under the law, any reason you could not return a guilty verdict in this case?"); see also , e.g. , State v. Coles , 467 S.W.2d 889, 890 (Mo. 1971) (no improper commitment where prosecutor asked jurors *379 if they had any belief "that might prevent you from returning a verdict of guilty" if evidence was otherwise sufficient to convict); State v. Jolliff , 867 S.W.2d 256, 260 (Mo. App. E.D. 1993) (no error in permitting prosecution to ask if venire members "would require more than just one witness' testimony or a certain type of evidence to convict," since questions merely asked "if they had preconceived ideas that would prevent them from following the law").[5]
As in Manley , "the purpose of the prosecutor's question" concerning motive was not to commit the venire members to a particular course of action, but was instead "to determine whether the venire could follow the trial court's instructions and recognize the State's burden to prove all elements of the charges beyond a reasonable doubt." 414 S.W.3d at 569. The circuit court did not abuse its discretion in overruling Conaway's objection to the prosecutor's voir dire questioning concerning motive. Point I is denied.
II.
In his second Point, Conaway argues that the circuit court erred in overruling his motions for judgment of acquittal, because there was insufficient evidence to support his kidnapping conviction.
An appellate court's review of the sufficiency of the evidence to support a criminal conviction is limited to determining whether there is sufficient evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. All evidence and inferences favorable to the State are accepted as true, and all evidence and inferences to the contrary are rejected. This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt.
State v. Porter , 439 S.W.3d 208, 211 (Mo. banc 2014) (citations and internal quotation marks omitted).
Section 565.110 provides:
1. A person commits the crime of kidnapping if he or she ... unlawfully confines another without his or her consent for a substantial period, for the purpose of:
(1) Holding that person for ransom or reward, or for any other act to be performed or not performed for the return or release of that person; or
(2) Using the person as a shield or as a hostage; or
(3) Interfering with the performance of any governmental or political function; or
(4) Facilitating the commission of any felony or flight thereafter; or
(5) Inflicting physical injury on or terrorizing the victim or another.
2. Kidnapping is a class A felony unless committed under subdivision (4) or (5) of subsection 1 in which cases it is a class B felony.
*380 Conaway was prosecuted pursuant to § 565.110.1(2), for confining the Victim "for the purpose of ... [u]sing [him] as a shield."
Conaway challenges the sufficiency of the evidence concerning a single element of the kidnapping offense: whether he confined the Victim "for a substantial period." He does not contend that the evidence was insufficient to establish that he unlawfully confined the Victim, that the confinement occurred without the Victim's consent, or that he engaged in this confinement "for the purpose of using [the Victim] as a shield."
" '[S]ubstantial period' is not defined" in § 565.110. State v. Sistrunk , 414 S.W.3d 592, 600 (Mo. App. E.D. 2013). Sistrunk refused to adopt a "bright-line," strictly quantitative analysis of the term. Id. Instead, drawing on cases from other jurisdictions, Sistrunk held that the duration of confinement was merely one factor to be considered in determining whether a defendant had confined his victim "for a substantial period."
[T]he meaning of the term is not solely a "quantity" inquiry, but rather a "qualitative" inquiry upon other circumstances surrounding the confinement-regardless of the duration of confinement-such as whether the confinement was independently criminally significant or whether the confinement increased the risk of harm to the victim.
Id. at 604 (citations omitted). "[T]he gravamen of the crime of kidnapping premised upon confinement, is the increased risk of harm caused to the victim, and the length or duration of confinement is just one factor in determining whether there was an increased risk of harm...." Id. at 600.
In Sistrunk , the defendant tied a shop owner's hands and ankles together in the back of a retail store, in the course of a robbery of the store. Id. at 595. The victim "testified that he was able to withdraw from confinement and exit the store for help after only one or two minutes...." Id. at 600. Despite the brevity of the confinement, Sistrunk found it sufficient to satisfy the "substantial period" requirement, because the confinement was forcible; it prevented the shop owner from leaving the store or summoning assistance, thus allowing the defendant to prolong the robbery and flee without capture; and the confinement made it more difficult for the victim to report the crime, and made defendant's criminal activity less observable. Id. at 605.
Under Sistrunk , the State presented sufficient evidence to find that Conaway confined the Victim "for a substantial period." Conaway may only have confined the Victim for 90 seconds for the purpose of using him as a shield in his encounter with the police officers. As Sistrunk makes clear, however, the statutory requirement that a victim be confined "for a substantial period" is not a strictly quantitative measure, and the time period during which the Victim was confined in this case is consistent with the "one or two minutes" for which the victim was confined in Sistrunk. 414 S.W.3d at 600. In addition, Conaway's confinement of the Victim in this case had independent criminal significance: confinement of a person for use as a shield is defined by statute as an aggravated form of kidnapping, without reference to any other offense the perpetrator may be attempting to commit. Finally, Conaway's confinement of the Victim plainly exposed the Victim to a substantial risk of serious injury, either from the firearms which the officers had drawn, or from the Taser which they ultimately deployed. The danger was particularly significant because Conaway confined the Victim "during a highly volatile and dangerous situation, increasing the likelihood of harm" to the Victim. Id. at 604 (discussing State v. Carrasquillo , 173 Vt. 557, 795 A.2d 1141, 1145-46 (2002) ). Indeed, the Victim was actually *381 shocked by the Taser which was deployed against Conaway, because Conaway was holding the Victim so close to shield himself from the device.
Conaway argues that his conduct presented no increased risk of harm to the Victim, because his confinement of the Victim was "merely incidental" to the other offenses with which he was charged. Sistrunk holds that, "[u]nder Missouri precedent, the offense of kidnapping can only be sustained where the movement or confinement of the victim is more than 'merely incidental' to another offense." 414 S.W.3d at 600 (quoting State v. Williams , 860 S.W.2d 364, 366 (Mo. App. E.D. 1993) ). In this case, Conaway's act of shielding himself with the Victim's body was alleged as an essential element of both of the other offenses with which Conaway was charged (endangering the welfare of a child, and resisting arrest). Conaway argues that, because his act of shielding himself with the Victim was an essential basis for his conviction of both other offenses, his act of shielding was "merely incidental" to those other offenses, and could not support a kidnapping conviction.
We disagree. Sistrunk 's holding that a kidnapping conviction can only be sustained where the confinement of the victim is not "merely incidental" to another offense has no application here. Sistrunk involved a different kidnapping offense than the one with which Conaway was charged. In Sistrunk , kidnapping was charged under § 565.110.1(4)-involving the unlawful confinement of a victim "for the purpose of ... [f]acilitating the commission of any felony or flight thereafter." See 414 S.W.3d at 599. The other Missouri cases cited in Sistrunk which apply the "merely incidental" requirement likewise involve kidnapping for the purpose of facilitating the commission of another felony, or for the purpose of inflicting physical injury or terrorizing the victim in violation of § 565.110.1(5).[6] The other Missouri cases which hold that the confinement of the victim must be more than "merely incidental" to the commission of another offense also involve prosecutions under §§ 565.110.1(4) or (5).[7]
In the context of kidnapping prosecutions under §§ 565.110.1(4) or (5), the *382 "merely incidental" test is animated by a concern that " 'virtually all conduct within the scope of kidnapping law is punishable under some other criminal provision,' " and that "a kidnapping charge [would be] added or 'pyramided' upon the underlying offense, in order to obtain a more severe punishment, although the confinement or asportation was merely incidental of the underlying offense." Sistrunk , 414 S.W.3d at 602 (citation omitted).
Kidnapping for the purpose of facilitating the commission of another felony (§ 565.110.1(4) ), or for the purpose of inflicting physical injury or terrorizing the victim (§ 565.110.1(5) ), are materially different from the kidnapping offenses criminalized by §§ 565.110.1(1) through (3). The kidnapping offenses defined in subsections (1) through (3) involve holding a victim for ransom, using a victim as a shield or hostage, or confining the victim in order to interfere with the performance of a governmental function. The legislature deemed the kidnapping offenses defined by subsections (1) through (3) to be more serious than the offenses defined by subsections (4) and (5), because the offenses defined under subsections (1) through (3) are classified as class A felonies, while the offenses defined by subsections (4) and (5) are class B felonies. See § 565.110.2.
The official Comment to the 1973 proposed Criminal Code makes clear that the drafters of the kidnapping statute viewed the offenses defined by subsections (1) through (3) as involving inherent risks which were not adequately addressed by other criminal statutes, and that the "merely incidental" standard does not apply to such offenses. The Comment states:
Kidnapping is designed to cover those situations where the confinement or movement of a person without his consent involves a high risk of injury or death, or where it creates a harm (including the terror of the victim) that is not adequately covered by another offense. Subsections 1(1), (2) and (3) clearly involve these types of situations and the confinement or movement for these purposes will not necessarily involve the commission of another offense. Kidnapping is not meant to cover the confinement or movement which is merely incidental to the commission of another offense. For example, many robberies will involve temporary confinement or movement for a short distance (as when the victim is made to move to another part of a room). To take such incidental confinement or movement and punish it as kidnapping would be making two crimes out of what is basically one offense. In these situations the movement or confinement does not add any additional danger to what is already present from the crime of robbery, and there is no purpose served by punishing this movement or confinement as the very serious offense of kidnapping.... How much movement or confinement is needed as a proper basis for kidnapping cannot be defined precisely as it will vary according to the circumstances. If the defendant has as his purpose the using of the victim as a shield, or holding him for ransom, then almost any movement or confinement should suffice . Removing the victim from his place of residence or business should suffice for any of the listed purposes. Beyond this, all that can be clear is that the confinement or movement should be considerably more than that which is merely incidental to the *383 commission of another offense. A confinement or movement which is incidental to the other offense is not kidnapping.
(Emphasis added.) The Comment states that kidnapping for the purpose of shielding inherently involves "a high risk of injury or death"; that such an act of kidnapping often may not constitute another offense; and that, with respect to this kidnapping offense, "almost any ... confinement" should be sufficient to support prosecution, without regard to whether the confinement is "merely incidental" to another offense.
The "merely incidental" test discussed in Sistrunk is not applicable here, where Conaway was charged under § 565.110.1(2) with unlawfully confining the Victim "for the purpose of ... [u]sing the [Victim] as a shield." Instead, the question whether a defendant can simultaneously be convicted of kidnapping for the purpose of shielding, and of other offenses arising out of the same conduct, should be addressed under general criminal-law principles. Section 556.041 provides in relevant part that
[w]hen the same conduct of a person may establish the commission of more than one offense he or she may be prosecuted for each such offense. Such person may not, however, be convicted of more than one offense if:
....
(3) The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct....
Conaway's simultaneous prosecution for kidnapping and other offenses was not prohibited by § 556.041(3). To determine whether prosecution of multiple offenses is barred by § 556.041(3), we must consider "whether each offense requires proof of a fact that the other does not." State v. Alexander , 505 S.W.3d 384, 397 (Mo. App. E.D. 2016). It is true that the State alleged in connection with each offense that Conaway held the Victim in front of his body during his encounter with police. Despite this overlap, each offense required proof of facts which the others did not. For example, to find Conaway guilty of kidnapping, the jury had to find that he "unlawfully confined" the Victim, "for a substantial period," "for the purpose of ... using [him] as a shield." To convict Conaway of child endangerment, the State had to prove that the Victim was less than seventeen years old, and that by holding the Victim in front of him, Conaway knowingly created a substantial risk to the Victim's life and health. § 568.045.1(1). With respect to resisting arrest, the State had to prove that a law enforcement officer was attempting to detain Conaway, and that Conaway knew this; that Conaway fled from the officer to prevent the detention; and that in fleeing, he created a substantial risk of serious physical injury or death to the Victim by using the Victim as a shield. §§ 575.150.1(1), .5. Given the difference in the elements of the three offenses, the State was not prohibited from prosecuting Conaway for all three offenses, although they arose from the same underlying incident.
Conaway's position-that the "merely incidental" test should apply to kidnapping for the purpose of shielding-would be unworkable. For example, in this case, in addition to kidnapping, Conaway was charged with endangering the welfare of the Victim, and with resisting a lawful detention. Conaway's briefing acknowledges that it is unclear which of those other counts should be considered the "underlying offense" for purposes of determining if the kidnapping charge involved "merely incidental" conduct. Conaway's confusion on this point is understandable: the fact is, the kidnapping charge in this case has no underlying offense-it is a *384 "stand-alone," independent criminal charge.
Conaway's approach would be even more difficult to apply in cases in which kidnapping for the purpose of shielding was charged alone, with no additional charges. Under Conaway's suggested approach, if kidnapping was the only charged offense, a defendant would be entitled to scour the criminal statutes to search for any other offense which could have been charged, and then argue that the conduct underlying the kidnapping charge was "merely incidental" to the other (uncharged) offense which the defendant's research had discovered. Where a defendant's underlying conduct potentially constitutes multiple different criminal offenses, it is for a prosecutor to decide which offense to charge; a defendant cannot override that exercise of prosecutorial discretion by arguing that another offense could have been charged. See , e.g. , State v. Honeycutt , 96 S.W.3d 85, 89 (Mo. banc 2003) ("a prosecutor has broad discretion to determine when, if, and how criminal laws are to be enforced, and [ ] this decision is seldom subject to judicial review") (citations omitted); State v. Rose , 481 S.W.3d 145, 148 (Mo. App. W.D. 2016) (" 'When the State has probable cause to believe a crime has been committed, the decision whether or not to prosecute and what charges to file generally rests entirely within the prosecutor's discretion.' ") (citation omitted).
Point II is denied.
Conclusion
The judgment of the circuit court is affirmed.
All concur.

We view the evidence in the light most favorable to the verdict. State v. Chambers , 481 S.W.3d 1, 8 n.5 (Mo. banc 2016).

Conaway was also charged with burglary in the first degree (Count II) and domestic assault in the third degree (Count V). The State dismissed those counts on the first day of trial.

Conaway's reliance on State v. Kiner, 441 S.W.2d 720 (Mo. 1969), is misplaced. In Kiner, the State asked several prospective jurors, over defense objections, "if the state proves to you beyond a reasonable doubt as to the guilt of the defendant, is there any reason you could not and would not vote to find him guilty?" Id. at 722. In Kiner the State directly asked venire members for their assurance that they "would ... vote to find [the defendant] guilty" if the State satisfied its burden of proof. The prosecution sought no similar commitment in this case.

See Sistrunk , 414 S.W.3d at 600, 601, 605, citing State v. Brock , 113 S.W.3d 227, 231 (Mo. App. E.D. 2003) (terrorizing the victim); State v. Morrow , 941 S.W.2d 19, 21 (Mo. App. W.D. 1997) (facilitation of another felony); Williams , 860 S.W.2d at 366 (facilitation of other felony); State v. Brown , 824 S.W.2d 924, 927 (Mo. App. W.D. 1992) (inflicting physical injury or terrorizing the victim); State v. Erby , 735 S.W.2d 148, 149 (Mo. App. E.D. 1987) (facilitation of another felony); State v. Jackson , 703 S.W.2d 30, 34 (Mo. App. E.D. 1985) (facilitation of another felony); State v. Lint , 657 S.W.2d 722, 724 (Mo. App. E.D. 1983) (inflicting physical injury or terrorizing the victim); Brock v. Denney , No. 4:06CV1103TCM, 2009 WL 3228694, *14 (E.D. Mo. Sept. 30, 2009) (inflicting physical injury or terrorizing the victim). State v. Morrison , 980 S.W.2d 332 (Mo. App. E.D. 1998), is unclear as to the specific subsection under which kidnapping was charged in that case. The facts make clear, however, that the defendant was not prosecuted under subsections (1) through (3) for confining a person for the purpose of recovering a ransom or reward; using the person as a hostage or shield; or interfering with a governmental function.

See State v. Taylor , 317 S.W.3d 89, 92 (Mo. App. E.D. 2010) (inflicting physical injury or terrorizing the victim); State v. Shelton , 78 S.W.3d 200, 204 (Mo. App. W.D. 2002) (facilitation of another felony); State v. Bess , 73 S.W.3d 791, 793 (Mo. App. E.D. 2002) (facilitation of another felony); State v. Lyles , 996 S.W.2d 713, 715-16 (Mo. App. E.D. 1999) (facilitation of another felony); State v. Tomlin , 864 S.W.2d 364, 366-67 (Mo. App. E.D. 1993) (facilitation of another felony); State v. Woodland, 768 S.W.2d 617, 619 (Mo. App. E.D. 1989) (facilitation of another felony); State v. Jackson , 703 S.W.2d 23, 24-25 (Mo. App. E.D. 1985) ; State v. Stewart , 615 S.W.2d 600, 602 (Mo. App. W.D. 1981) (facilitation of another felony and inflicting physical injury or terrorizing the victim).