

# Missouri Court of Appeals
## Southern District

### In Division

STATE OF MISSOURI,                    )
                                      )
    Plaintiff-Respondent,             )
                                      )
vs.                                   )       No. SD37914
                                      )
DUSTIN CURTIS WINTER,                 )       **Filed:  September 19, 2024**
                                      )
    Defendant-Appellant.              )

APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

The Honorable David C. Jones, Judge

## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS

Dustin Curtis Winter ("Winter") appeals the judgment of the Circuit Court of Greene County ("trial court"), convicting him of murder in the first degree (Count I) and kidnapping in the first degree (Count II).  *See* sections 565.020 and 565.110.[1]  Winter claims the trial court erred in overruling his motions for judgment of acquittal on Count I in that there was insufficient evidence for a reasonable fact finder to find (1) E.M. ("Victim") was murdered or, if he was murdered, that Winter "perpetuated" the murder where evidence of motive and opportunity alone

---

[1] References to sections 565.020 and 565.110 are to RSMo 2016, including, as applicable, statutory changes effective July 13, 2016, and January 1, 2017.

was sufficient to support a murder conviction (Point I); and (2) Winter had deliberated in the murder of Victim where there was no evidence of how and under what circumstances Victim was murdered (Point II). Winter claims in Point III that the trial court erred in overruling his motions of judgment of acquittal on Count II in that there was insufficient evidence that Victim was confined "for a substantial period" and that confinement was more than merely incidental to some unknown other offense. In his fourth and last point on appeal, Winter claims that the trial court plainly erred in executing its written judgment in that it materially differs from the trial court's oral pronouncement at sentencing.

Finding no merit in Points I and II, we deny those points. However, we do find merit in Points III and IV. Point III is granted and we reverse the trial court's judgment on Count II. Point IV is granted and we remand the case with instructions to the trial court to vacate the judgment of kidnapping in the first degree on Count II and enter an amended written judgment that reflects the trial court's oral pronouncement at sentencing on Count I.

**Factual Background and Procedural History**

In October of 2018, Victim moved back to Missouri from California; Victim was living with his mother in Springfield in the summer of 2019. Victim had one sister, who he was in continuous contact with, and the two saw each other multiple times a week once Victim moved back to Missouri. During the second week of July in 2019, Winter was having a discussion with his friends K.P. and W.A.S. Winter informed his two friends that a "guy" he knew had returned from California, and Winter had a problem with him because the man had allegedly raped his girlfriend. Winter told K.P. and W.A.S. that he was looking for their help to "fuck [Victim] up." Winter planned to "play nice" with Victim in order to "get him to agree to come help him or hang out with him or do something." During a later conversation, Winter, K.P., and W.A.S.

2

agreed that they would confront Victim at the home of T.S., a friend of Winter's, on Central Street. Around that time, Winter rented a U-Haul van, which he was seen with from mid-July until mid-August of the same year.

On July 23, 2019, Winter texted his girlfriend, S.S., that he was "going after [Victim] and going to make sure he suffers slowly with pain and agony." During the same text exchange, Winter again told S.S. that he was "going after [Victim]."

On July 26, 2019, Winter messaged Victim on Facebook, saying "Hey, if you ain't doin' shit, could I get your help possibly?" Victim responded, "[w]hat do you need?" around two hours later. Winter told Victim that he "[h]onestly just [needed an] extra set of hands for a couple items and company so [he] ain't so bored." Victim agreed to join Winter and Winter told Victim that he could pick him up whenever he was available.

One minute later, Winter messaged K.P., "So what are you and [W.A.S.] doing at the moment?" When K.P. did not respond, Winter texted K.P. again at 7:28 p.m., "PVC pipe and zip ties, items not to forget lol." Winter spoke to Victim on the phone, then texted K.P. at 7:59 p.m. that he had "[j]ust got off the phone with dude and being told where to pick him up. How's it look on that end?" At 8:27 p.m., Victim texted Winter, "I'm running to Hy-Vee. Guess I'll try you in a bit." Winter texted K.P. at 8:46 p.m., stating that he was "heading to dude who is 5-10 min down the road from where I'm at." At 8:56 p.m., K.P. responded that she and W.A.S. were going "where we talked about[,]" the house on Central Street.

At 9:06 p.m., Winter responded to Victim's text from 8:27 p.m., stating, "I'm coming down Fort. Sorry. Dude called me needing his money but I'm almost there." At 9:07 p.m., Winter texted K.P., "K. I'm in route to get dude." At 9:08 p.m., K.P. messaged Winter to inform him that she and W.A.S. had arrived at the house on Central Street.

3

At 9:13 p.m., Winter received a text message from Victim's phone number that stated, "[Victim] ran to Hy-Vee. Should be back in ten to fifteen or less." Winter texted S.S. at 9:21 p.m., "I love you and I miss you so much. I haven't been ignoring you. I've been overloading myself fulfilling my word to you." Winter asked S.S. if she could call, saying that it was "[e]xtremely" important. Before the call, Winter texted S.S., "You don't have to say anything. I just can't text the info I need you to hear." Winter and S.S. then talked on the phone for one minute and 28 seconds, followed by a second phone call at 9:32 p.m. for approximately five minutes. These phone calls were placed from Victim's apartment complex.

At 9:41 p.m., Winter texted Victim, "[s]o I'm just chilling in the parking lot," to which Victim responded, "[a]lmost done." Victim told Winter he had time to go get food, after which Winter went to a nearby McDonald's and returned to the apartment complex by 9:58 p.m. Winter texted Victim, "I'm back outside eating. I shouldn't be hard to miss." Victim then asked if Winter could call him, and they talked on the phone for one minute and five seconds.

At 10:41 p.m., GPS data placed Winter at the house on Central Street, where T.S., W.A.S., and K.P. were already present. At 10:50 p.m., W.A.S. texted Winter, "Bro, wtf." Winter replied with a question mark. At 10:52 p.m., W.A.S. responded, "Nothing id [sic] going as planned. . . . We should have done more planning." Winter responded that he needed someone to open the gate to the property, after which W.A.S. responded, "I can just come open it, let yall [sic] through, and just do the damn thing if you want." At 11:00 p.m., W.A.S. texted Winter, "Look, bro, this fucking shit is stupid. Let's just fucking tell him what we are gonna do it [sic] and then do it, you know."

At 11:30 p.m., Winter texted S.S. that he was on the highway. At 11:44 p.m., Winter texted S.S. again, asking her to call him because "[s]omething ain't right." At 12:36 a.m., in the

4

early morning hour of July 27, 2019, S.S. responded, "Stop what you're doing." Winter replied at 12:38 a.m., "What do you mean? I'm out here driving circles waiting for you. Dude's already fucked up. . . . Call me please. I don't know what I am doing now." At 1:01 a.m., he texted S.S., "Am I picking you up still? You coming back? Or you sticking me with this?" At this time, GPS placed Winter in the Mark Twain National Forest.

At 1:39 a.m., Winter texted S.S. again, "Great. Guess I'm fucked and played on all this." During this time, Winter continued driving through the Mark Twain National Forest, stopping at several locations for a period of time. These areas were "highly wooded, very rural, with nobody around."

Google records from 6:40 p.m. to 7:01 p.m., on July 27, 2019, show Winter googled "sulfuric acid," "sulfuric acid or muriatic acid," and "sulfuric acid on animals." He also visited a website titled "Can acid dissolve a body?" Winter also googled "55 gallon drum."

In the last week of July, 2019, Winter arrived in his U-Haul van at what was then D.C. and his ex-wife's ("T.C.") house on North National Street. D.C. saw that the doors of the U-Haul were open, and noticed that there was "a bunch" of blood in the back of the U-Haul, "[l]ike a horror movie." Winter, with a handgun on his person, informed D.C. that if he didn't help clean the van Winter would kill him. Winter and T.C. told D.C. that Winter had hit a deer in the van, and if D.C. did not help clean, he would "end up like the deer." While cleaning the van, D.C. noticed bloody rope, trash bags, and two bloody tire rims[2] in the back of the van. D.C. watched Winter take the bloody rope and trash bags from the van and burn them in D.C.'s burn barrel. D.C. also saw Winter take the rims and tires inside the house.

---

[2] D.C. clarified in his testimony at trial that by "rims" he meant, "[t]he whole tire, rim and tire."

On August 13, 2019, D.C. contacted a Springfield police officer, informing him that he had information regarding a homicide that involved a suspect and a U-Haul van. D.C. told the officer the U-Haul contained "an amount of blood [in the back] that was more than normal." The officer located the U-Haul van on August 14, 2019, at D.C.'s home, but was undercover and unable to make a traffic stop. The officer obtained a different vehicle to perform the stop of the U-Haul, and found the U-Haul later that same day at a Save a Lot grocery store parking lot roughly four blocks from D.C.'s home. When Winter pulled the van away from the parking lot, the officer started his lights in an attempt to pursue a traffic stop. The officer got out of his vehicle, but when a vehicle in front of the U-Haul van moved, the U-Haul van "jumped the curb and headed south on National." The officer initiated a pursuit at that time.

Winter drove at excessive speeds, ran stop signs, violated traffic ordinances, and drove in a hazardous manner to flee from the officer. The officer pursued Winter until they reached the Webster County line, after which the Missouri State Highway Patrol took over the pursuit. Winter then crashed down a 30-feet embankment from the intersection of two highways into an RV lot, after which the van was on its side and was smoking.

The U-Haul was processed by a Springfield police corporal on August 15, 2019. During the processing, several areas of red stains that appeared to be blood were found. The corporal took 32 swabs from the interior of the van, and sprayed the interior with Bluestar.[3] There were traces of washed blood found in the cargo section of the van. The DNA profile found on one of the swabs matched Victim's DNA profile.

---

[3] The officer testified at trial that Bluestar is a spray used by police as a presumptive test for blood. The spray will "reveal blood stains that have been wiped away or washed away or even invisible to the naked eye."

Winter was arrested on August 14, 2019, after which T.C. asked D.C. to dispose of a motorcycle helmet bag. In late August of 2019, D.C. turned the bag over to a detective. Three debit cards, two EBT cards, and a State of Missouri temporary identification card, all of which were in the name of Victim, were found inside the bag.

Although they conducted multiple searches, law enforcement was unable to find any physical evidence suggesting Victim was in the Mark Twain National Forest, and K-9 units were unable to locate Victim's body. A canine indicated the presence of decaying human remains in the location where GPS indicated Winter had stopped, as well as in the crawl space of T.C. and D.C.'s home. Law enforcement was unable to find any sort of acid, or any zip ties, rope, or PVC pipe during their investigation.

Winter was charged with one count of murder in the first degree and one count of kidnapping in the first degree. At the time of the jury trial in September 2022, law enforcement continued an open investigation looking for Victim as a missing person. Victim's family last saw him during the last week of July 2019. The jury found Winter guilty on both counts. Winter was sentenced to life imprisonment without the possibility of parole for murder in the first degree, and life imprisonment for kidnapping in the first degree, each sentence to be served consecutively to the other. In its written judgment, however, the trial court indicated that Winter was sentenced to "999 days" imprisonment on both counts.[4] This timely appeal followed.

---

[4] For both counts, murder in the first degree and kidnapping, the judgment states, "Length: 999 Days[.]"; however, the text directly below the length states, "Text: LIFE IMPRISONMENT DOC[.]"

**Standard of Review**

Sufficiency of the Evidence (Points I, II, and III)

"An appellate court's review of the sufficiency of the evidence to support a criminal conviction is limited to determining whether there is sufficient evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *State v. Porter*, 439 S.W.3d 208, 211 (Mo. banc 2014).

> In determining whether there is sufficient evidence "to support a conviction and to withstand a motion for judgment of acquittal, this Court does not weigh the evidence but rather accepts as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict, and ignores all contrary evidences and inferences." *State v. Gilmore*, 537 S.W.3d 342, 344 (Mo. banc 2018) (alterations omitted), quoting *State v. Ess*, 453 S.W.3d 196, 206 (Mo. banc 2015).

*State v. Cross*, 672 S.W.3d 865, 867 (Mo. App. S.D. 2023) (quoting *State v. Lehman*, 617 S.W.3d 843, 846-47 (Mo. banc 2021)). This Court cannot determine the credibility of witnesses, nor weigh the evidence. *State v. Mitchell*, 203 S.W.3d 246, 249 (Mo. App. S.D. 2006). We do not act as a "super juror" with "veto powers," but instead this Court gives great deference to the trier of fact. *State v. Miller*, 448 S.W.3d 331, 334 (Mo. App. S.D. 2014) (quoting *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998)). "Circumstantial rather than direct evidence of a fact is sufficient to support a verdict." *State v. Jackson*, 681 S.W.3d 248, 258 (Mo. App. S.D. 2023) (quoting *State v. Hilleman*, 634 S.W.3d 709, 713 (Mo. App. S.D. 2021)). "If circumstantial evidence supports equally valid inferences, it is up to the fact-finder to determine which inference to believe." *Id.* Thus, this Court does not assess whether the evidence at trial established guilt beyond a reasonable doubt, but rather looks to the question of whether any rational finder of fact "could have found the essential elements of the crime beyond a reasonable doubt." *State v. Devalkenaere*, 684 S.W.3d 1, 13 (Mo. App. W. D. 2023) (quoting *State v. Liberty*, 370 S.W.3d 537, 542-43 (Mo. banc 2012)). When determining sufficiency of *corpus*

*delicti*[5] proof, the reviewing court views evidence and reasonable inferences in the light most favorable to the verdict, disregarding all contrary evidence and inferences.  ***State v. Schmidt***, 630 S.W.3d 802, 807-08 (Mo. App. E.D. 2021) (citing ***State v. Bullington***, 684 S.W.2d 52, 57 (Mo. App. W.D. 1984)).

## Points on Appeal

<u>Point I: There is sufficient evidence for a reasonable fact-finder to find Winter guilty of murder in the first degree.</u>

In his first Point on Appeal, Winter claims there is insufficient evidence to prove beyond a reasonable doubt that Victim was murdered, and, even if Victim was murdered, there is insufficient evidence to prove Winter was the perpetrator.  We disagree.

*Analysis*

"The State has the burden of establishing the *corpus delicti*."  ***State v. Hayes***, 347 S.W.3d 676, 681 (Mo. App. E.D. 2011) (citing ***State v. Edwards***, 116 S.W.3d 511, 544 (Mo. banc 2003)).  To prove the *corpus delicti* of a homicide case, the State must prove two elements:  "(1) proof of the death of the victim and (2) evidence that the criminal agency of another was the cause of the victim's death."  ***State v. Whirley***, No. WD85439, 2024 WL 3034854, *6 (Mo. App. W.D. Jun. 18, 2024) (quoting ***Edwards***, 116 S.W.3d at 544).  The death must be proven not to be "self-inflicted, accidental, or due to natural causes."  ***Schmidt***, 630 S.W.3d at 807.  The *corpus delicti* "may be proven solely by circumstantial evidence," and does not need to prove the impossibility of the defendant's innocence.  ***Id.*** (citing ***State v. Williams***, 66 S.W.3d 143, 153

---

[5] "The term 'corpus delicti' is Latin for 'body of the crime.'  Black's Law Dictionary 346 (7th ed.1999)."  ***State v. Madorie***, 156 S.W.3d 351, 353 (Mo. banc 2005).  "The term is used in the context of criminal law to describe the prosecutor's burden of proving that a crime was committed by *someone*, independent from a defendant's extrajudicial statements."  ***Id.*** at 353-54.

(Mo. App. S.D. 2021)).  "Circumstantial evidence and permissible inferences from it are acceptable, and generally will provide the necessary proof."  *Hayes*, 347 S.W.3d at 681 (quoting *State v. Candela*, 929 S.W.2d 852, 868 (Mo. App. E.D. 1996)).

After proving the victim has, in fact, died, the State must prove the victim's death was due to the criminal agency of another.  *State v. Elledge*, 673 S.W.3d 826, 831 (Mo. App. W.D. 2023) (citing *State v. Howery*, 427 S.W.3d 236, 244 (Mo. App. E.D. 2014)).  "A person commits the offense of murder in the first degree if he or she knowingly causes the death of another person after deliberation upon the matter."  Section 565.020.1.  The crime of murder in the first degree is completed when an individual (1) knowingly, (2) causes the death of another person, (3) after deliberation upon the matter.  *State v. Shaddox*, 598 S.W.3d 691, 695 (Mo. App. S.D. 2020).  Direct evidence of motive and opportunity alone is not sufficient to support a murder conviction.  *See State v. Shaw*, 602 S.W.3d 17, 20 (Mo. App. E.D. 1980) (holding that direct evidence which showed defendant was in the house where the crime occurred, had a motive, and may have had an opportunity to kill the victim, but did not show that the defendant fired the fatal shots, was insufficient to support the conviction of manslaughter).  However, because circumstantial evidence is granted the same weight as direct evidence, "circumstantial evidence alone can be sufficient to support a conviction."  *State v. Lowery*, 652 S.W.3d 783, 788 (Mo. App. E.D. 2022).

Here, Winter first argues that because Victim's body was never recovered, the evidence does not prove beyond a reasonable doubt that Victim has died.  Winter claims there was a lack of sustained efforts to find Victim as an alleged homicide victim.  In support of his claims, Winter points to the trial testimony of Detective Patton, who testified that an ongoing, open missing-persons investigation would continue until Victim was found.  Winter argues that there

10

was no testimony that suggested Victim's disappearance was abrupt or mysterious, and there was no evidence, aside from the black bag with Victim's bank cards and temporary Missouri identification card, that Victim had abandoned his personal effects.

Winter further argues that there is insufficient evidence to support a reasonable inference that Victim's death was caused by another's criminal agency. At most, Winter claims, the evidence supports an inference of a hostile relationship between Winter and Victim, and an opportunity for Winter to commit the alleged crime. Winter argues that motive and opportunity alone are not enough to substantiate a murder claim, especially where no body has been recovered. He points to a lack of confession by Winter to committing any aspect of the murder and the existence of only one blood swab confirmed to belong to Victim. Winter claims the small amount of blood swabbed, coupled with the evidence that Winter was in contact with Victim to elicit help on a project, creates a "tenuous, at best, and speculative, at worst" inference that Victim was dead by the illicit acts of someone else.

Winter's arguments ignore our standard of review, which requires all evidence and inferences be viewed in the light most favorable to the verdicts, and all negative evidence and inferences must be ignored. *State v. Stewart*, 560 S.W.3d 531, 533 (Mo. banc 2018) (citing *State v. Wright*, 382 S.W.3d 902, 903 (Mo. banc 2012)). This Court will only determine whether any reasonable trier of fact could have found the elements of *corpus delicti* satisfied beyond a reasonable doubt, not whether the evidence establishes guilt. *State v. Welch*, 603 S.W.3d 745, 747 (Mo. App. S.D. 2020). Circumstantial evidence of a fact is sufficient to support a verdict, and if the circumstantial evidence supports equally valid inferences, it is up to the fact-finder, not the Court, to determine which inference to believe. *State v. Salsman*, 686 S.W.3d 376, 390 (Mo. App. S.D. 2024) (citing *Jackson*, 681 S.W.3d at 258).

11

In viewing the evidence in the light most favorable to the State, there is sufficient evidence to believe that Victim is deceased, with the cause of death determined to have occurred from criminal conduct. Victim, who was frequently in contact with his sister, had not communicated with or been seen by his family since the last week of July 2019. Leading up to the alleged incident, Winter sent multiple text messages to his friends and girlfriend from which a reasonable juror could infer that there was criminal activity afoot, and that the criminal activity was done knowingly and with deliberate planning. Winter texted he would be "going after [Victim]" "to make sure he suffers slowly with pain and agony." Winter collaborated with K.P. and W.A.S. in planning and carrying out the incident. Winter reminded K.P. to bring "PVC pipe and zip ties" and that Victim was "already fucked up." W.A.S. texted Winter that "[they] should have done more planning." During the police investigation, a police canine indicated the presence of human remains in the GPS locations where Winter had stopped, as well as in the crawl space of T.C. and D.C.'s home. These messages planning the attack and describing Winter's objective, as well as the indication of human remains in multiple locations, could give the jury a basis to infer that Winter knowingly, and deliberately, caused the death of Victim.

The jury could logically find that the murder occurred in the back of the U-Haul van. The existence of 32 red stains, coupled with the stains that were uncovered during the Bluestar search, could persuade the jury of a large amount of blood loss. One red stain was swabbed for DNA testing, and the testing revealed that the DNA profile from the swab matched the DNA profile of Victim. In his testimony, D.C. described large amounts of blood in the U-Haul, as well as a bloody rope and trash bags, and admitted to aiding Winter in cleaning the U-Haul with bleach and soap at the end of July of 2019. D.C. witnessed Winter place bloody rope and trash bags into a burn barrel and burn them. This testimony, along with the blood stain and DNA

testing, provides sufficient evidence for a reasonable juror to conclude the murder occurred in the back of the U-Haul.

Winter's actions after the alleged incident occurred could also persuade a reasonable jury of criminal activity. On the night of the alleged incident, Winter drove around a highly wooded, very rural portion of the Mark Twain National Forest until approximately 2:00 a.m., and his internet history for the following evening included searches for "sulfuric acid," "sulfuric acid on animals," and "Can acid dissolve a body?" Further, Winter's accomplice, T.C., possessed Victim's motorcycle helmet bag, and inside was Victim's identification card, debit cards, and EBT cards. This evidence could lead a reasonable jury to believe there was a method of disposing of the body and attempts to hide evidence of criminal activity.

Additionally, Winter's actions upon police presence may persuade a reasonable jury of criminal activity and guilt. "A defendant's flight upon realizing the presence of police can constitute additional evidence of guilt[.]" *Interest of D.L.T.*, 673 S.W.3d 844, 850 (Mo. App. E.D. 2023) (quoting *State v. Keeper*, 787 S.W.2d 887, 890 (Mo. App. E.D. 1990)). While flight alone does not establish wrongdoing, flight may be considered in support of a conviction along with other evidence of guilt. *State v. Franco-Amador*, 83 S.W.3d 555, 559 (Mo. App. W.D. 2002) (citing *State v. Schwartz*, 899 S.W.2d 140, 144-45 (Mo. App. S.D. 1995)). Upon realizing the presence of police while at the store in August of 2019, Winter "jumped the curb" in the U-Haul; drove at excessive speeds and in a hazardous manner; ran stop signs; and violated traffic ordinances in attempts to flee from the officer. His dangerous flight behavior continued when he reached the Webster County line, after which the Missouri State Highway Patrol took over the pursuit. The pursuit only ended when Winter crashed down a 30-foot embankment and could no

longer operate the U-Haul. Winter's attempted flight, when considered with all other evidence, could lead a reasonable jury to find Winter guilty.

The evidence is also sufficient for a fact-finder to conclude that Winter was the perpetrator of Victim's alleged murder. Evidence suggests there was an acrimonious relationship between Winter and Victim due to Victim's alleged conduct regarding Winter's girlfriend, from which the jury could infer motive for Winter to complete the alleged murder. Winter also created the opportunity to complete the alleged murder by contacting Victim and initiating a meet-up. While not alone sufficient to support a conviction, evidence of motive and opportunity, coupled with other circumstantial evidence suggesting guilt, is sufficient to find Winter guilty. *See State v. Bolds*, 913 S.W.2d 393, 398 (Mo. App. W.D. 1996) (holding "[w]hile opportunity alone is insufficient to support conviction, evidence of opportunity and motive aids in determining guilt[,]" and finding sufficient evidence to prove arson where the defendant had the means, opportunity and motive for setting the fire).

Even though Victim's body had not been recovered at the time of trial, there was sufficient evidence for a reasonable trier of fact to determine the State proved the *corpus delicti* of a homicide case, proof of Victim's death, and evidence that the criminal agency of another was the cause of Victim's death. "The trier of fact may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances, and other testimony in the case." *State v. Dodd*, 637 S.W.3d 659, 668 (Mo. App. W.D. 2021) (citing *State v. Crawford*, 68 S.W.3d 406, 408 (Mo. banc 2002)). In sum, the evidence, when viewed in a light most favorable to the verdict, is sufficient to support the jury's verdict. The witness testimony at trial, text messages, and other circumstantial evidence admitted at trial was sufficient for a reasonable jury to find both elements of *corpus delicti* to be satisfied. Further, the evidence at trial could

14

reasonably be used to infer Winter's culpability in that there existed an objective in meeting Victim, a method and place which the incident occurred, and manner in which to dispose of the body. A reasonable jury could use the totality of the evidence to conclude Winter is guilty of the charge of murder in the first degree. For that reason, Point I is denied.

<u>Point II: There is sufficient evidence for a reasonable fact finder to find Winter deliberated in Victim's murder.</u>

In his second Point on Appeal, Winter claims there is insufficient evidence to prove beyond a reasonable doubt that Winter satisfied the deliberation element of murder in the first degree. Again, we disagree.

*Analysis*

"A person commits the offense of murder in the first degree if he or she knowingly causes the death of another person after deliberation upon the matter." Section 565.020.1. Deliberation is defined as a "cool reflection for any length of time no matter how brief[.]" Section 565.002(5), RSMo Supp. 2017. "[T]he element of deliberation serves to ensure that the jury believes the defendant acted deliberately, consciously and not reflexively." ***State v. Nathan***, 404 S.W.3d 253, 266 (Mo. banc 2013). Deliberation may be inferred from circumstantial evidence. ***State v. Gomez***, 672 S.W. 3d 113, 120 (Mo. App. S.D. 2023) (citing ***State v. Miller***, 220 S.W.3d 862, 868 (Mo. App. W.D. 2007)). "Evidence that a defendant did or said certain things prior to the act in order to facilitate the crime . . . is conduct relevant to deliberation." ***Shaddox***, 598 S.W.3d at 696. A fact-finder can infer motive to kill, and hence deliberation, from a hostile relationship. ***State v. Scott***, 676 S.W.3d 336, 344 (Mo. App. E.D. 2023) (citing ***Gomez***, 672 S.W.3d at 120). Furthermore, a defendant's conduct after the alleged incident, as well as any disposal of evidence, can also support a finding of deliberation. ***Howery***, 427 S.W.3d at 246.

15

Viewing the evidence in a light most favorable to the State, there is sufficient evidence from which the jury could infer Winter possessed the requisite deliberation. Before the alleged murder, Winter spent multiple days considering and planning the attack on Victim with K.P. and W.A.S. Winter discussed the hostile nature of his relationship with Victim with K.P. and W.A.S. during the second week of July 2019, stating that Winter had a problem with Victim because Victim had allegedly raped his girlfriend and robbed him. He then told both K.P. and W.A.S. that he wanted help to "fuck [Victim] up." Around the same time as the initial interaction between Winter, K.P., and W.A.S., Winter rented the U-Haul and was seen driving it from mid-July to mid-August. During a later conversation with K.P. and W.A.S., the three individuals decided where the altercation was going to take place. On July 23, 2019, Winter sent text messages to his girlfriend indicating that he would be "going after" Victim. Winter carried out the plan he had concocted by picking up Victim on the night of July 26, 2019, pretending to be friendly and asking for Victim's help. The testimony and text messages indicate that Winter had planned and considered the attack for at least multiple days, with discussions regarding the incident spanning from the second week of July 2019, to July 26, 2019. This constitutes more than enough time for the "cool reflection" required for deliberation. Evidence of these actions taken before the alleged murder are sufficient for a jury to find deliberation to have occurred.

Winter's actions after the alleged murder, including efforts to dispose of evidence, are also sufficient for a reasonable fact-finder to determine deliberation. Winter brought the U-Haul van to T.C.'s house, where T.C. and D.C. helped him clean out the van. During this time, Winter, T.C., and D.C. used bleach and soap to clean the substance from the back of the van. Winter also took a bloody rope and black trash bags from the back of the van and burned them in a burn barrel. Winter was researching "sulfuric acid" and "Can acid dissolve a body" only one

16

day after his altercation with Victim. After Winter's arrest, T.C. asked D.C. to dispose of a bag containing Victim's debit and EBT cards and temporary Missouri identification card. A reasonable juror could infer that the actions taken after the alleged incident were an attempt to conceal Winter's involvement in Victim's death. Because Winter's conduct before and after the alleged murder, as well as the disposal of the evidence, could be considered deliberation, there is sufficient evidence for a fact-finder to find deliberation to be satisfied.

The evidence of Winter's actions before, during, and after the alleged murder create a sufficient basis upon which a fact-finder could find Winter satisfied the deliberation requirement. For that reason, Point II is denied.

Point III: Sufficient evidence does not exist to support an inference that Victim's confinement was more than merely incidental to the offense of first-degree murder.

In Point III, Winter first argues that there is insufficient evidence to show he unlawfully confined Victim without his consent for a substantial period as required by the Missouri kidnapping statute, and that there is insufficient evidence by which it could be reasonably inferred that the confinement of Victim was more than merely incidental to the offense of murder in the first degree. We agree and reverse the trial court's decision.

*Analysis*

An individual commits kidnapping in the first degree if he or she:

> unlawfully removes another person without his or her consent from the place where he or she is found or unlawfully confines another person without his or her consent for a substantial period, for the purpose of . . . (4) [f]acilitating the commission of any felony or flight thereafter; or, (5) [i]nflicting physical injury on or terrorizing the victim or another.

Section 565.110.1.[6] A "substantial period" is not defined in the statute, and, in ***State v. Sistrunk***, the Eastern District of this Court held that it was not appropriate to adopt a bright-line analysis of

---

[6] Subsections included in this statute but unrelated to this case omitted.

"substantial period" as the statute does not require it. 414 S.W.3d 592, 600 (Mo. App. E.D. 2013). Instead, the court emphasized increased risk of harm caused to the victim as the essence of the kidnapping, with the length or duration of confinement only being one factor used in determining the increased risk. *Id.* Additionally, there is no kidnapping if the defendant invites the victim to accompany him to a particular place, and the victim consents to go, regardless of whether the defendant has hidden the wrongful purpose. *State v. Porter*, 241 S.W.3d 385, 394 (Mo. App. W.D. 2007) ("[I]f A invites B to accompany him to a particular place, and B consents to go, there is no kidnapping, even if A has hidden wrongful purpose, such as to steal from B").

"Under Missouri precedent, the offense of kidnapping can only be sustained where the movement or confinement of the victim is more than merely incidental to another offense." *Sistrunk*, 414 S.W.3d at 600 (internal quotations omitted); *see also State v. Williams*, 860 S.W.2d 364, 366 (Mo. App. E.D. 1993) (holding "[t]he offense of kidnapping should not be used in situations where the movement or confinement is merely incidental to another offense"). "However, disallowing a kidnapping conviction whenever another offense is committed would make subsection 4 of the statute meaningless." *Id.*

For kidnapping to be sufficiently distinct, the movement or confinement must add an additional danger to what is already present from the crime. *State v. Conaway*, 557 S.W.3d 372, 380-82 (Mo. App. W.D. 2018). To determine whether confinement is merely incidental to another offense, "we look to see if there was any increased risk of harm or danger to the victim from the movement or confinement that was not present as the result of the other offense." *Williams*, 860 S.W.2d at 366. The "merely incidental" test negates the concern that a kidnapping charge could be "pyramided" upon any underlying offense, even though the confinement was merely incidental to the underlying offense. *Conaway*, 557 S.W.3d at 382.

18

Here, we determine there is not sufficient evidence to suggest that the kidnapping is more than merely incidental to the murder, nor is there sufficient evidence to suggest that Victim was held for a "substantial period." Due to the circumstantial nature of the case, no evidence exists that relates to the amount of time Victim was held in the van, whether the Victim was held against his will, or whether Victim was transferred to T.C. and D.C.'s home without consent. Victim consented to helping Winter, and agreed to Winter picking him up at his apartment. There is no evidence that can be used to discern or infer the exact time Victim revoked consent, if he did so at all. Movement of a victim is only a crime when it is *both* "unlawful" and "without consent." *Porter*, 241 S.W.3d at 394. There is no evidence to conclude that Victim was unaware that he and Winter were going to T.C. and D.C.'s home. Therefore, there is no evidence that the movement became nonconsensual.

Additionally, if the movement was not consensual, there is no evidence to suggest that the movement or purported confinement was anything more than merely incidental to the alleged murder. There is no evidence that the movement or confinement itself added an additional danger that was not part of the other offense. Murder is inherently dangerous, with the objective being to end a human life. There is no evidence that the movement or confinement of Victim posed any greater threat than the threat of murder that he already faced.

The circumstantial nature of the case leaves much to be inferred, but a reasonable jury lacks sufficient evidence to support the finding that Victim was kidnapped in a manner that was more than merely incidental to the murder. The lack of evidence demonstrating revoked consent, substantial confinement, or added danger due to movement or confinement that was not already present from the danger of murder leaves little evidence for a reasonable juror to conclude that Winter kidnapped Victim. For this reason, Point III is granted.

<u>Point IV: Remand is required to correct the trial court's written judgment *nunc pro tunc*.</u>

Winter's fourth point on appeal claims the trial court plainly erred in executing its written judgment in that the sentence recited materially differs from the trial court's oral pronouncement. The State agrees. We remand the matter to the trial court for it to enter a judgment *nunc pro tunc* to correctly reflect the sentencing.

*Analysis*

> "[T]he written sentence and judgment of the trial court should reflect its oral pronouncement of sentence before the defendant." *State ex rel. Zinna v. Steele*, 301 S.W.3d 510, 514 (Mo. banc 2010) (internal quotes and citation omitted). "[I]f a material difference exists between the written judgment and oral pronouncement, the oral pronouncement controls." *Id.* (internal quotes and citation omitted). The failure to accurately memorialize the decision of the trial court as it was announced in open court is a clerical mistake. *State v. Davie*, 638 S.W.3d 514, 524 (Mo. App. W.D. 2021). "Clerical errors in the sentence and judgment in a criminal case may be corrected by order nunc pro tunc if the written judgment does not reflect what was actually done." *Id.* (quoting *State v. Knox*, 604 S.W.3d 316, 325 (Mo. banc 2020) and citing Rule 29.12(c)).

**State v. Robinson**, 685 S.W.3d 32, 34 (Mo. App. W.D. 2024). Remand is the appropriate remedy for a clerical error that is correctable *nunc pro tunc*. **State v. McClurg**, 543 S.W.3d 78, 83 (Mo. App. S.D. 2018).

Winter claims that the trial court plainly erred by executing its written judgment:

> in that the 999-day sentence recited in [the] written judgment of conviction . . . on Counts I and II . . . materially differs from the trial court's oral pronouncement of a life sentence for each of these counts such to constitute a manifest injustice or miscarriage of justice.

The State agrees the trial court's written judgment incorrectly reflects the oral pronouncement and should be remanded so the error in the trial court's judgment can be corrected to conform to the trial court's oral pronouncement at sentencing. The record clearly shows that while the trial court's written judgment indicates that Winter was sentenced to 999-days imprisonment on both counts, the trial court's oral pronouncement sentenced Winter to life imprisonment on Counts I

20

and II.  "Errors of this nature are 'clerical,' and may be corrected *nunc pro tunc*."  **State v. Pierce**, 678 S.W.3d 115, 125 (Mo. App. S.D. 2023) (quoting **State v. Fewins**, 638 S.W.3d 36, 39 (Mo. App. S.D. 2021)).

Accordingly, Point IV is granted and this case is remanded to the trial court for entry of a written judgment that conforms with the trial court's oral pronouncement of the sentence.

### Conclusion

The evidence introduced at trial, viewed in the light most favorable to the verdict, is sufficient to support the conviction of murder in the first degree.  However, this Court determines the State's evidence is insufficient to support a conviction of kidnapping in the first degree.  Additionally, we determine the clerical error in the written judgment must be corrected.  Points I and II are denied.  Points III and IV are granted.  We affirm the trial court's judgment as to Count I, murder in the first degree, but reverse the trial court's judgment on Count II, kidnapping.  The case is remanded with directions that the trial court vacate the conviction and sentence for kidnapping in the first degree, and to enter a judgment *nunc pro tunc* to correctly reflect the oral pronouncement of a life sentence on Count I.

JENNIFER R. GROWCOCK, J. – OPINION AUTHOR

JEFFREY W. BATES, J. – CONCURS

MARY W. SHEFFIELD, J. – CONCURS

21